**922**

ASSOCIATED GENERAL CONTRAC-
TORS OF CALIFORNIA, INC., et
al., Plaintiffs-Appellants,

v.

CITY AND COUNTY OF SAN FRAN-
CISCO, Defendant-Appellee,

and

San Francisco Black Chamber of Com-
merce, et al.,
Intervenors-Defendants/Appellees.

No. 85–2420.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 1986.

Decided March 23, 1987.

John H. Findley, Sacramento, Cal., for plaintiffs-appellants.

Mara E. Rosales, San Francisco, Cal., for defendant-appellee.

Robert L. Harris, San Francisco, Cal., William C. McNeill, III, Oakland, Cal., for intervenors-defendants/appellees.

Before HUG, BEEZER and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

We consider a challenge to an ordinance of the City and County of San Francisco (the city) giving various preferences to minority-owned, women-owned and locally-owned business enterprises (MBEs, WBEs and LBEs). The district court upheld the ordinance, rejecting claims that it violates the city's charter, federal civil rights laws and the equal protection clause of the fourteenth amendment.

## Facts

On April 2, 1984, after numerous hearings and considerable debate, the San Francisco Board of Supervisors enacted Chapter 12D of the City's Administrative Code (the ordinance). The ordinance was designed to increase the participation of MBEs, WBEs and LBEs in municipal contracting, and thereby to alleviate the "historic discrimination against minorities and women, often officially sanctioned and enforced by government from the inception of our Republic to the present." Ordinance § 12D.2(1).

The ordinance employs four principal methods. First, it requires each city department to set aside 10 percent of its purchasing dollars for MBEs and 2 percent for WBEs. *Id.* § .8(B)(2). Second, it gives MBEs, WBEs and LBEs a 5 percent bidding preference for those contracts put out to bid.[1] *Id.* § .8(B)(3). Third, it requires each city department to establish a yearly goal for the percentage of contracting dollars to go to MBEs, WBEs and LBEs. For certain public works contracts, a prospective prime contractor must submit a bid that meets or exceeds the department's goal by distributing among appropriate subcontractors the requisite percentage of the contract's value. *Id.* § .9(B)(1). Finally, the ordinance establishes as an overall goal that 30 percent of the city's contracting dollars shall go to MBEs and 10 percent to WBEs. *Id.* § .3. The ordinance is to remain in effect until that goal is reached. *See id.* § .15(A).

Appellants sued seeking declaratory and injunctive relief. Their motion for a preliminary injunction was denied on November 5, 1984. They appealed that decision but, before this court could rule, the district court heard the parties' cross-motions for summary judgment and granted that of the appellees. *Associated Gen. Contractors v. City & County of San Francisco,* 619 F.Supp. 334, 335 (N.D.Cal.1985). The preliminary injunction appeal was then dismissed, appellants pursuing instead their appeal from the district court's decision on the merits.[2]

## Contentions of the Parties

Appellants mount their attack on three fronts. First, they argue that, as to contracts valued over $50,000, the preferences violate a San Francisco City Charter provision requiring that contracts be awarded to "the lowest reliable and responsible bidder." S.F. Charter § 7.200 (1986).[3] Next, they contend that the preferences for MBEs violate three separate federal civil rights statutes: 42 U.S.C. §§ 1981, 1983, 2000d (1982). Finally, they argue that all the preferences violate the equal protection clause of the fourteenth amendment of the United States Constitution. Appellees forcefully dispute each of these contentions.

## Jurisdiction

The district court had jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and pendent jurisdiction over the state law claim. *See UMW v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We have jurisdiction under 28 U.S.C. § 1291.

## Discussion

### I. THE CHARTER [4]

 A. Appellants claim that, by compelling city departments to accept bids that

---

1. Locally-owned MBEs and WBEs get a 10% preference.

2. Even though only the grant of defendant's summary judgment motion is before us, we may afford complete relief, if appropriate, to either party. *See Morgan Guar. Trust Co. v. Martin,* 466 F.2d 593, 600 (7th Cir.1972) (interpreting 28 U.S.C. § 2106).

3. When appellants brought this suit, section 7.200 covered contracts worth more than $15,-000. The amount was increased to $50,000 on June 3, 1986, ten days before this case was submitted.

4. We consider the pendent state claim first because its resolution might obviate the need to reach the merits of a difficult federal constitutional question. *See Schmidt v. Oakland Unified School Dist.,* 457 U.S. 594, 595, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982).

are not the lowest, the ordinance violates S.F. Charter § 7.200 which provides:

> When the expenditure for any public work or improvement shall exceed the sum of fifty thousand dollars ($50,000), the same shall be done by contract, except as otherwise provided in this charter. The head of the department in charge of or responsible for the work for which a contract is to be let, or the purchaser of supplies in the case of purchases of materials, supplies and equipment, *shall let such contract to the lowest reliable and responsible bidder....* [Emphasis added.]

In *Inglewood-Los Angeles County Civic Center Authority v. Superior Court,* 7 Cal.3d 861, 500 P.2d 601, 103 Cal.Rptr. 689 (1972), the California Supreme Court interpreted California Government Code section 25454, a provision very similar to charter section 7.200. It held that the term "responsible"

> has reference to the quality, fitness and capacity of the low bidder to satisfactorily perform the proposed work. Thus, a contract must be awarded to the lowest bidder unless it is found that he is not responsible, i.e., not qualified to do the particular work under consideration.

*Id.* at 867, 500 P.2d at 604, 103 Cal.Rptr. at 692 (citations omitted). In reaching this result, the court relied on cases interpreting similar language in other statutes and, in one case, *West v. City of Oakland,* 30 Cal.App. 556, 159 P. 202 (1916), a city charter. We followed *Inglewood* in overturning a school district's plan for accepting higher bids from minority contractors, stating that "[w]e do not think that the California Supreme Court would construe the

term ... differently from the construction it gave the same language in *Inglewood;* the statutes are virtually identical." *Associated Gen. Contractors v. San Francisco Unified School Dist.,* 616 F.2d 1381, 1385 (9th Cir.1980) *(Unified School District).* We have found no California case interpreting the term "responsible" any other way.

Despite these seemingly compelling authorities, the district court adopted a much more expansive construction of charter section 7.200, concluding that "the concept of responsibility is sufficiently flexible to embody other legitimate municipal concerns such as the remedying of past discrimination." 619 F.Supp. at 336.[5] The district court purported to follow the reasoning of *Southwest Washington National Electrical Contractors Association v. Pierce County,* 100 Wash.2d 109, 667 P.2d 1092 (1983), which interpreted the term responsible to mean "socially responsible." [6] In the Washington Supreme Court's view, a business that failed to meet affirmative action goals was socially irresponsible. *Id.* at 115, 667 P.2d at 1095–96. The district court also reasoned that its interpretation of the term responsible "is clearly consistent with the two purposes generally underlying competitive bidding statutes: 1) to protect the general public from cronyism or collusion in the awarding of contracts and, 2) to provide a fair forum for potential bidders." 619 F.Supp. at 337 (citing *Southwest Washington,* 100 Wash.2d at 116, 667 P.2d at 1096).

We are unable to approve the district court's interpretation of the term "responsible" in San Francisco charter section 7.200. First, and most fundamentally, the district court was led astray by following

---

5. We understand the district court's ruling to cover the LBE preference as well, thus including the city's desire to ease the burden on local businesses as one of the "legitimate municipal concerns" encompassed in the "concept of responsibility."

6. The court below also cited *Weiner v. Cuyahoga County Comm. Coll. Dist.,* 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), *cert. denied,* 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970), where the Ohio Supreme Court stated that "the capacity to assure a performance which complies with antidiscrimination laws is reasonably a part of the

standard of a best or responsible bidder on a contract involving the expenditure of public funds." *Id.* at 39, 249 N.E.2d at 910. We fail to see how this unremarkable proposition supports the district court's conclusion. A contractor's ability to comply with all relevant laws—be they those pertaining to safety, taxation or discrimination—is certainly relevant to whether it is responsible. Here, the city does not claim that non-MBE contractors are less capable of complying with antidiscrimination laws than MBE contractors.

inapposite authorities and ignoring pertinent ones. *Southwest Washington* expressly rejected Ninth Circuit precedent, 100 Wash.2d at 115, 667 P.2d at 1096; the district court was not free to follow suit. *Unified School District* and the California cases on which it relies construed language very similar to that in charter section 7.200. The district court was required to follow Ninth Circuit precedent in applying California law as California courts construe it. And California courts have uniformly construed the term "lowest responsible bidder" to mean the bidder who can be expected to successfully complete the contract for the lowest price.[7]

Moreover, we find the district court's reasons for following *Southwest Washington* unpersuasive. Its assertion that a broad reading of the term "responsible" is consistent with the purposes underlying competitive bid statutes misconstrues those purposes. The first purpose enumerated by the district court—protecting the public from cronyism and collusion—is much too narrow. Competitive bid statutes are designed to protect against a variety of ills that might befall the government procurement process: sloth, lack of imagination or carelessness on the part of those who award public contracts; inadequate notice to potential bidders, causing contracting officers to act on the basis of ignorance or misinformation; and, perhaps most important of all, insufficient competition to assure that the government gets the most work for the least money. *See generally* J. Whelan & R. Pasley, *Cases & Materials on Federal Government Contracts* 175–81 (1975).

The second purpose cited by the district court—"to provide a fair forum to potential bidders"—is far too broad. Nothing in charter section 7.200, or in any other competitive bid statute of which we are aware, assures that contractors will be treated fairly in any and all respects. The provision assures only that responsible contractors who submit the lowest bid will be awarded the contract. Under the district court's interpretation, there is no limit to the type of fairness a city could seek to achieve, defeating the charter's mandate that contracts be awarded to the lowest bidder.[8]

Finally, the district court's ruling goes far beyond even the logic of *Southwest Washington.* The Washington Supreme Court there held that a bidder is responsible if he awards a portion of his subcontracts to MBEs and WBEs. Under that approach, a contractor has a fair measure of control over whether or not he is deemed responsible; an irresponsible contractor can become responsible by awarding a larger share of subcontracts to MBEs and WBEs. *Southwest Washington,* 100 Wash.2d at 112, 667 P.2d at 1094. Thus, while the Washington Supreme Court gave the term "responsible" an expansive interpretation, it retained the concept's essential characteristic as a description of a bidder's willingness and ability to comply with applicable standards. By contrast, the district court here removed all connection between "responsibility" and volitional action. A contractor is deemed responsible not because of how it conducts its business but because of what it is: A firm that qualifies as an MBE, WBE or LBE is conclusively deemed responsible; a firm that does not is

---

7. Whatever may have been the record presented in *Southwest Washington,* nothing before us suggests that the term "responsible" in the San Francisco City Charter, adopted in 1932, was meant to do more than exclude those contractors "not qualified to do the particular work under consideration." *Inglewood,* 7 Cal.3d at 867, 500 P.2d at 604, 103 Cal.Rptr. at 692. That is a concept capable of relatively precise definition and objective application. Notions of social responsibility, commendable as they may be, are of a wholly different character. One person's social responsibility is another's officious intermeddling. The district court's approach removes an objective standard from the

charter and substitutes for it a concept so nebulous that it removes any meaningful constraint on the Board's actions.

8. The city could, for example, steer contracts to particular neighborhoods, if it thought it fairer to enrich Nob Hill at the expense of Russian Hill. Or it might choose to favor businesses with poor owners or those that are failing. Fairness means different things to different people, many of them inconsistent with the requirement that contracts be awarded to the "lowest reliable and responsible bidder."

conclusively deemed irresponsible. By holding that "the concept of responsibility is sufficiently flexible to embody other legitimate municipal concerns such as the remedying of past discrimination," 619 F.Supp. at 336, the district court transformed a limitation on the city's power into a broad authorization for preferring some contractors over others on the basis of innate characteristics such as race and gender, or whatever other "legitimate municipal concerns" the city might wish to pursue. We doubt that even the *Southwest Washington* court would have gone that far.

**B.** Appellees argue in the alternative that the ordinance does not violate the city charter because it does not contravene an express prohibition. They note that there is no express prohibition against affirmative action, and so urge us to conclude, as did the district court, that the ordinance must be valid.

We reject this argument for two reasons. First, whether or not the charter contains a prohibition against affirmative action is irrelevant. It does include a general prohibition against accepting other than the lowest bid, subject only to specific exceptions. *See* pp. 927–928 *infra*. Second, appellees misunderstand the longstanding rule that there are no limits to a chartered city's regulation of municipal affairs "except as expressly limited by the charter provisions." *City of Grass Valley v. Walkinshaw*, 34 Cal.2d 595, 599, 212 P.2d 894, 896 (1949). While, as appellees argue, "[a]ll rules of statutory construction as applied to charter provisions ... are subordinate to this controlling principle," *id.*, this simply means that an older principle—that cities receive only those powers delegated by the state—does not apply to chartered cities. *See id.; see, e.g., Long v. City of Fresno*, 225 Cal.App.2d 59, 64–65, 36 Cal.Rptr. 886, 890–91 (1964). This rule only prohibits inferring limitations from the absence of an express grant of power; it provides no help in interpreting an express limitation like section 7.200.

**C.** Finally, amicus supporting the city notes that the charter expressly allows the Board of Supervisors to accept bids other than the lowest in some circumstances. For example, charter section 7.204 provides that

> [in] any contract for any public work or improvement, or for the purchase of materials ... [the Board may provide] a preference in price not to exceed 10 percent ... in favor of such materials as are to be manufactured, fabricated or assembled within the City and County of San Francisco as against similar materials which may be manufactured, fabricated or assembled outside thereof.

In addition, of course, section 7.200 itself exempts contracts worth $50,000 or less from the low bid restriction.

Insofar as the city charter itself provides exceptions to the rule that contracts be awarded to the lowest responsible bidder, preferences falling within the contours of those exceptions are valid. But it is difficult to understand how this helps the city with respect to those preferences that do violate charter section 7.200. The normal inference is to the contrary. Since the charter's framers found it necessary to add express exceptions to the requirement that all contracts go to the "lowest reliable and responsible bidder," charter section 7.200 can only be read as a general limitation on the city's power.[9]

In sum, we conclude that the ordinance violates the city charter insofar as it authorizes the award of contracts that are worth more than $50,000 and are not covered by charter section 7.204 to other than lowest responsible bidders. Insofar as the ordinance's bid preferences, subcontracting goals and set asides would result in awards that violate the charter, they are void. Be-

---

**9.** Appellants also argue that in enacting the ordinance the Board usurped functions that the charter reserved to heads of departments or the purchasers of supplies. This is meritless. Although department heads, knowing the peculiar requirements of their agencies, presumably have some authority to determine whether a low bidder is "responsible" (i.e. able to do the work), the Board is authorized to establish general bidding procedures and contracting requirements. *See* S.F. Charter §§ 7.200, 7.205.

cause the ordinance contains a severability provision, it continues to apply to contracts for $50,000 or less.[10] We must therefore consider appellant's remaining challenges to the ordinance insofar as it applies to such contracts for $50,000 or less.

## II. THE EQUAL PROTECTION CLAUSE [11]

Because not all classifications drawn in the ordinance are equally suspect, we discuss the ordinance's treatment of MBEs, WBEs and LBEs separately.

### A. The MBE Preferences

The parties disagree on the proper level of review. Appellants argue that the ordinance's racial and ethnic preferences should be subjected to strict scrutiny; the city claims that a three part test, examining the Board of Supervisors' authority, findings and methods, is appropriate. Both parties are right. The level of review is indeed strict scrutiny, but not the old strict scrutiny that was " 'strict' in theory but fatal in fact." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 361–62, 98 S.Ct. 2733, 2784–85, 57 L.Ed.2d 750 (opinion of Brennan, White, Marshall & Blackmun, JJ.); *see also United States v. Paradise*, — U.S. —, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987)

(plurality opinion); *Wygant v. Jackson Bd. of Educ.*, — U.S. —, 106 S.Ct. 1842, 1852, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring). The form that scrutiny has taken in affirmative action cases does call for an examination of the three factors appellees suggest and all sides discuss. First, we must consider whether the city had the authority to act; second, we must examine whether its findings are adequate; finally, we must determine whether the means it selected are appropriate.[12]

### 1. Authority

Relying on *Fullilove v. Klutznick*, 448 U.S. 448, 499, 100 S.Ct. 2758, 2785, 65 L.Ed.2d 902 (1980), appellants contend that only Congress may enact affirmative action programs because only Congress has the authority to act under section 5 of the fourteenth amendment. However, appellants overlook that the *Fullilove* plurality relied on section 5 as authority only for the federal government's imposition of affirmative action on state and local governments. *Fullilove*, 448 U.S. at 476–78, 100 S.Ct. at 2773–75 (opinion of Burger, C.J.). It relied on the commerce clause to justify the imposition of the program on private contractors. *Id.* at 475–76, 100 S.Ct. at 2773–74.

---

10. The ordinance's severability clause, Ordinance § 12D.16, is persuasive evidence that the Board would want the preferences to apply to contracts for $50,000 or less. Because contracts over $50,000 "can be mechanically severed" from the coverage of the ordinance, this presumption of severability is not rebutted. *Schenley Affiliated Brands Corp. v. Kirby*, 21 Cal. App.3d 177, 199, 98 Cal.Rptr. 609, 626 (1971); *see also Tip Top Foods, Inc. v. Lyng*, 28 Cal. App.3d 533, 552, 104 Cal.Rptr. 718, 731 (1972).

11. Appellants allege that the ordinance deprives them of their right to equal protection under the Fourteenth Amendment. Section 1983 provides a cause of action for deprivations of federal rights under color of state law. Section 2000d provides a cause of action for discrimination on the basis of race. The Supreme Court has held that the rights protected by sections 1983 and 2000d extend as far as the equal protection clause's guarantees against racial discrimination. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287, 333, 98 S.Ct. 2733, 2746, 2770, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.; opinion of Brennan, White, Marshall and Blackmun, JJ.) (§ 2000d). It is not entirely clear whether the remaining statute, section 1981, gives protec-

tions beyond those provided by the fourteenth amendment, *see, e.g., Setser v. Novack Inv. Co.*, 657 F.2d 962, 966 (8th Cir.) (en banc), *cert. denied*, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981); *Local Union No. 35, Int'l Bhd. of Elec. Workers v. City of Hartford*, 625 F.2d 416, 425 (2d Cir.1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 977 (1981); *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671, 691–92 (6th Cir.1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). What *is* clear is that section 1981 applies only to discrimination based on race or color, *see Runyon v. McCrary*, 427 U.S. 160, 167–68, 96 S.Ct. 2586, 2592–93, 49 L.Ed.2d 415 (1976), so we would still have to examine appellant's remaining constitutional claims. We therefore assume, without deciding, that section 1981 extends no farther than the fourteenth amendment.

12. Unfortunately, as Justice Brennan noted recently, "although [the] Court has consistently held that some elevated level of scrutiny is required when a racial or ethnic distinction is made for remedial purposes, it has yet to reach consensus on the appropriate constitutional analysis." *Paradise*, — U.S. at ———, 107 S.Ct. at 1064 (plurality opinion).

█ Like the federal government, a state or its political subdivision has the authority—indeed the "constitutional *duty*," *Wygant*, 106 S.Ct. at 1856 (O'Connor, J. concurring) (emphasis original)—to ascertain whether it is denying its citizens equal protection of the laws and, if so, to take corrective steps. *See Ohio Contractors Ass'n v. Keip*, 713 F.2d 167, 172–73 (6th Cir.1983); *South Fla. Chapter v. Metropolitan Dade County*, 723 F.2d 846, 852 (11th Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *see also Paradise*, —— U.S. at ——, 107 S.Ct. at 1065 ("[t]he government unquestionably has a compelling interest in remedying past and present discrimination by a state actor") (plurality opinion), *id.*, at ——, 107 S.Ct. at 1075 (Powell, J., concurring). More than that we cannot say here. The extent to which the city may act depends on the factual record prompting the action and its range of available options, subjects we discuss below.

### 2. The Findings

**i.** The city is not just like the federal government with regard to the findings it must make to justify race-conscious remedial action. As Justice Powell noted in his *Fullilove* concurrence, "[t]he degree of specificity required in the findings of discrimination and the breadth of discretion in the choice of remedies may vary with the nature and authority of a governmental body." 448 U.S. at 515–16 n. 14, 100 S.Ct. at 2794, n. 14. This notion is also reflected in the plurality opinion:

> Here we deal … not with the limited remedial powers of a federal court, for example, but with the broad remedial powers of Congress. It is fundamental that *in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress*, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees.

*Id.* at 483, 100 S.Ct. at 2777 (emphasis added).

The Court's concern with the level of government adopting race-conscious legislation is based on important theoretical and practical considerations. *See generally* Note, *A Madisonian Interpretation of the Equal Protection Doctrine*, 91 Yale L.J. 1403 (1982) (*Madisonian Interpretation*). As Justice Stevens noted in his *Fullilove* dissent, "because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate." 448 U.S. at 534–35, 100 S.Ct. at 2803–04 (footnote omitted); *see also Paradise*, —— U.S. at —— n. 2, 107 S.Ct. at 1075 n. 2 ("racial distinctions are inherently suspect") (Powell, J., concurring). Where Congress itself acts, the broad spectrum of interests represented within our federal structure plays an important role in guaranteeing that individual rights will not be sacrificed to political expediency. However, as the Founding Fathers recognized, the narrower a government's domain, the greater the likelihood of oppression:

> The smaller the society, the fewer probably will be the distinct parties and interests composing it; the fewer the distinct parties and interests, the more frequently will a majority be found of the same party; and the smaller the number of individuals composing a majority, and the smaller the compass within which they are placed, the more easily will they concert and execute their plans of oppression. Extend the sphere, and you take in a greater variety of parties and interests; you make it less probable that a majority of the whole will have a common motive to invade the rights of other citizens; or if such a common motive exists, it will be more difficult for all who feel it to discover their own strength and to act in unison with each other.

*The Federalist* No. 10, at 22 (J. Madison) (2d ed. Johns Hopkins Univ.Press 1966). *See also Madisonian Interpretation*, 91 Yale L.J. at 1410 ("state procedure and structure reinforce the tendency of majorities to tyrannize minorities, federal procedure and structure weaken any such tendency").

■ While we have no occasion to define the precise contours of state or local governments' power to pass laws that favor one race or ethnic group over another, we note that the Supreme Court "never has held that societal discrimination alone is sufficient to justify a racial classification" by such entities. *Wygant*, 106 S.Ct. at 1847 (plurality opinion); *see also id.* at 1854 (O'Connor, J., concurring). At a minimum, the state or local government must be acting to remedy government-imposed discrimination, perpetrated by it or by one of its departments or divisions.[13] Unlike Congress, state or local governments do not have the power to discriminate on the basis of race simply to dispel the lingering effects of societal discrimination, "an amorphous concept of injury that may be ageless in its reach into the past." *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757 (opinion of Powell, J.); *see also Wygant*, 106 S.Ct. at 1854 (O'Connor, J., concurring).

The requirement that the governmental entity itself have discriminated finds support in a recent Supreme Court case on the subject: "[S]ome showing of prior discrimination *by the governmental unit involved* [must be made] before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant*, 106 S.Ct. at 1847 (plurality opinion) (emphasis added); *id.* at 1853 (O'Connor, J., concurring).[14] The governmental body in *Wygant*, a school board, had determined that the percentage of minority teachers was lower than the percentage of minorities in the student population and concluded that this was the result of societal discrimination. Such ambient discrimination was held to be an insufficient basis for upholding the school board's affirmative action program.

We recognize that the plurality opinion in *Wygant* commanded only four votes. Absent more definitive guidance, however, we consider the requirement that state and local governments act only to correct their own past wrongdoing a persuasive and principled way to reconcile *Wygant* and *Fullilove*. Moreover, we find the distinction a compelling one. Experience reinforces Madison's observation that at the lower levels of government it becomes much more likely "that measures [will be] too often decided, not according to the rules of justice and the rights of the minor party, but by the superior force of an interested and overbearing majority." *The Federalist* No. 10, at 16; *see also id.* No. 51, at 163 (J. Madison) ("a coalition of a majority of the whole society could seldom take place on any other principles than those of justice and the general good"). As Justice Powell stated in *Bakke*, "[t]o hold otherwise would be to convert a remedy heretofore reserved for violations of legal rights into a privilege that all institutions throughout the Nation could grant at their pleasure to whatever groups are perceived as victims of societal discrimination." 438 U.S. at 310, 98 S.Ct. at 2758–59; *see* note 17 & p. 935 *infra.* "That is a step [the Court has] never approved." *Id.; see also Wygant*, 106 S.Ct. at 1854 (O'Connor, J., concurring) ("a governmental agency's interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny").

With these observations in mind, we examine the city's extensive findings in support of the ordinance.

---

**13.** If a particular department is found to have acted in a racially discriminatory fashion, the city is not limited in its remedies to activities within that department alone. Once it discovers official discrimination that violates equal protection, the city may use all available resources to right the wrong. But righting the wrong is as far as it may go. It may not use the occasion to commit further discrimination.

**14.** In a case decided earlier this Term, the Justices seemed to agree that a finding of official discrimination was the necessary predicate for a district court decree imposing racially conscious remedies on employers. *Paradise*, —— U.S. at ——, 107 S.Ct. at 1064–66 (plurality opinion), *id.* at ——, 107 S.Ct. at 1076 (Powell, J., concurring), *id.* at ——, 107 S.Ct. at 1076 (Stevens, J., concurring), *id.* at ——, 107 S.Ct. at 1080 (O'Connor, J., dissenting). In the words of Justice Stevens, "the governmental decisionmaker who would make race-conscious decisions must overcome a strong presumption against them." *Id.* at ——, 107 S.Ct. at 1078.

**ii.** To its credit, the city did not act precipitously in adopting the ordinance. The record discloses a careful and deliberate effort to ascertain whether MBEs (as well as WBEs) had been the subject of invidious discrimination and, if so, what to do about it. The process started on December 13, 1982, when the Board of Supervisors adopted Resolution No. 952–82 "calling upon the Mayor to request [the Human Rights Commission] to hold public hearings to investigate the extent of minority and women business participation in City and County contracts." Human Rights Commission of San Francisco, *Investigation Into Minority and Women Business Participation in City Contracting* (October 1983) (HRC Rep.). Pursuant to this resolution, the HRC staff solicited information from the city's 56 departments, divisions and bureaus in an effort to develop a picture of their procurement practices. The Commission checked the responses for accuracy and completeness; it then issued press releases and bought several newspaper advertisements inviting input from anyone with additional views or information. Letters were sent to "[f]ourteen minority and women business associations ... [and] more than 750 companies and individuals, with names drawn from almost every available source." *Id.* at 6.

Over 40 witnesses testified during four days of hearings. Twenty witnesses submitted written statements. *Id.* at 6–7. No one who wanted to testify was turned away. Officials of some of the city's departments also testified and answered questions. Many witnesses advocated race-conscious affirmative action measures for MBEs; no one spoke out against them. *Id.* at 92–93. The Commission then analyzed and summarized this mass of information in a 172–page report to the Board

of Supervisors. The Board conducted its own hearings and received further written reports. Only then did it pass the ordinance.

The city's procedures in considering and enacting the ordinance bespeak a careful and deliberate effort, one deserving the greatest deference consistent with our constitutional responsibility. At the same time, we are bound to scrutinize the ordinance closely and skeptically, as is appropriate whenever governmental action is challenged on the ground that it impairs personal liberties guaranteed by the constitution. "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Bakke*, 438 U.S. at 291, 98 S.Ct. at 2748 (opinion of Powell, J.).

The city's thorough fact-finding process makes painfully clear what the city did *not* conclude in its findings. Most significantly, there is no finding of "prior discrimination by the governmental unit involved." *Wygant*, 106 S.Ct. at 1847 (plurality opinion).[15] The findings discuss at some length such matters as the "historic discrimination against minorities and women, often officially sanctioned and enforced by government from the inception of our Republic to the present" and the "centuries of limited access to the marketplace" that these groups have suffered. Ordinance §§ 12D.2(1), (2).

The findings also fault "the departments and awarding authorities of the city and county of San Francisco" for "functioning without specific uniform standards and criteria in the award of contracts and leases," noting that "minority-owned and women-owned businesses and other small local businesses are particularly disadvantaged" by this lack of uniform standards.[16] *Id.* § 2(7)(a)(c). But nowhere does the city inti-

---

15. The commission did report allegations "that some staff have actually discriminated on the basis of race in awarding contracts." HRC Rep. 106. However, the commission made no finding of actual discrimination. The Board made no mention of these allegations, nor did it make findings of discrimination. We can only conclude that the allegations were not substantiated.

16. The inclusion of "other small local businesses" among those particularly disadvantaged by the city's haphazard contracting policies undercuts the city's approach somewhat. In the first place, it suggests that disadvantages suffered by MBEs and WBEs may be more a function of their size than the race or gender of their owners. Also, it leads to the inference that small businesses that are neither MBEs nor WBEs will now suffer a double whammy: the inequities of

mate that there has been any discrimination against minorities by city officials or under color of the city's authority.[17] Indeed, the only finding directly on point is that "[m]ost departments ... stated that the ethnicity of the contractor was unknown to them." HRC Rep. 106. Absent a finding of discrimination by city officials, "it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another. Thus, the government has no compelling justification for inflicting such harm." *Bakke*, 438 U.S. at 308–09, 98 S.Ct. at 2757–58 (opinion of Powell, J.).[18]

While the absence of a finding of official discrimination is the ordinance's most significant shortcoming, there are other serious problems as well. Before the city "embarks on an affirmative action program, it [must have] convincing evidence that remedial action is warranted." *Wygant*, 106 S.Ct. at 1848 (plurality opinion). The Board relied heavily on statistics purportedly demonstrating the "virtual exclusion of minority-owned and women-owned businesses from City contracts." Ordinance § 12D.2(7)(e). The statistics do not, however, bear out this assertion.[19] For example, the findings note that "[MBEs] and

the prior system plus the further competitive disadvantage visited upon them by the ordinance. Normally, burdens of remedial measures should be imposed on the "group which was in position to benefit from those [discriminatory] practices." *Ohio Contractors Ass'n v. Keip*, 713 F.2d 167, 173 (6th Cir.1983). "[T]here is a measure of inequity in forcing innocent persons ... to bear the burden of redressing grievances not of their making." *Bakke*, 438 U.S. at 298, 98 S.Ct. at 2752 (opinion of Powell, J.).

17. What the findings do contain is the following, which we find troubling:

[I]n a city which has a minority population of nearly 50%, a female population of nearly 60%, and a civilian work force which is 45% female, the public interest will best be served by our enactment of an Ordinance mandating policies and programs which will enhance the opportunities for women-owned and minority-owned businesses to become prime contractors in the provision of goods and services to the City and County of San Francisco....

Ordinance § 12D.2(3). This finding suggests that those who benefit from the ordinance may well outnumber those who suffer from it, coming uncomfortably close to demonstrating the wisdom of Madison's warning about the ease with which majorities in small communities can define the common good in a way that "will invade the rights of other citizens." *The Federalist* No. 10, at 22. *See also Madisonian Interpretation*, 91 Yale L.J. at 1407 ("[a]t the state level ... the smaller number of factions facilitates the forming of entrenched majority coalitions").

18. Both circuit decisions the city cites as approving race conscious remedies dealt with situations where there had been a finding of official discrimination. In *Ohio Contractors Ass'n*, "the United States District Court for the Southern District of Ohio [had] found that the state had become 'a joint participant' with private industry and certain craft unions in a pattern of racially discriminatory conduct which excluded

black laborers from work on public construction projects." 713 F.2d at 170–71. The Ohio state courts made similar findings as to discrimination in the awarding of state contracts. *Id.* at 171. The Ohio General Assembly "accepted the findings of Ohio courts, executive department investigations and earlier studies by committees of the legislature itself" in passing the statute in question. *Id.*

Our reading of *Ohio Contractors* is supported by the Sixth Circuit's more recent opinion in *J. Edinger & Son v. City of Louisville*, 802 F.2d 213 (6th Cir.1986). The Sixth Circuit there held unconstitutional a bid preference for minorities, women and the handicapped on Louisville's supply and service contracts. Like San Francisco, Louisville aimed its ordinance at " 'the correction of unequal opportunities historically generated and made available' " to those groups. *Id.* at 214. Distinguishing *Ohio Contractors*, the court held that a discrepancy between the composition of the population and the amount of business the city gave each group was insufficient to prove the intentional discrimination necessary to uphold the classification. *Id.* at 216.

The Eleventh Circuit's opinion in *South Florida Chapter v. Metropolitan Dade County*, 723 F.2d 846 (11th Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984), is somewhat less clear on this point, noting only that "although the present county government had not engaged in discriminatory practices, there had been *'identified discrimination* against Dade County black contractors at some point prior to the county's present affirmative action program.'" *Id.* at 853 (emphasis original). It does not matter of course whether discrimination is committed by current officials or their predecessors; government has the responsibility to correct its own past misconduct, whether or not the offending employees are still in place.

19. The court's responsibility to assure itself that statistics employed to justify discriminatory practices are relevant and meaningful was em-

[WBEs] combined received less than three percent (2.8 percent) of all prime contracts (exclusive of subcontracts) awarded during a base period of 1981 and 1982," *id.* § .2(7)(d), "notwithstanding the fact that MBEs represent in excess of thirty-three percent (33%), and WBEs twenty-five percent (25%) of all San Francisco based firms." *Id.* § .2(7)(e). While these numbers appear compelling, closer examination reveals flaws.

In the first place, the statistics seriously undercount minority (and women) participation in city contracting. As the ordinance recognizes elsewhere,[20] subcontracts account for a large portion of the city's contracting dollars. There is no finding—and we decline to assume—that male caucasian contractors will award contracts only to other male caucasians. If women- and minority-owned businesses are as prevalent as the city's findings suggest, such businesses may be earning a substantial portion of the city's contracting dollars by way of subcontracts. The curious exclusion of subcontracts in the city's findings [21] leaves us, as it did the Board, without an

accurate picture as to the extent of minority and women participation in the city's procurement process.[22]

In addition, the reference to 33 percent minority and 25 percent women enterprises in San Francisco is over-inclusive. These figures encompass a variety of businesses that do not provide goods or services subject to significant contracting by the city: ethnic restaurants, beauty parlors, newsstands and grocery stores, for example. The HRC Report in fact noted that "[a]vailability [of MBEs and WBEs] was difficult to assess accurately, as it is influenced by the number of firms which actually want to work for the City and also by the number of firms offering the kinds of services the City needs in any given year." HRC Rep. 98–99. Findings that would justify classifications based on race, potentially impairing the constitutional rights of those who are disadvantaged by them, must be drawn much more precisely and based upon more carefully selected and finely tuned data than those upon which the city relies here. *See Wygant,* 106 S.Ct. at 1848 (plurality opinion) (comparison between the racial

---

phasized by Justices Powell and O'Connor in *Wygant,* 106 S.Ct. at 1847–48 (plurality opinion); *id.* at 1856–57 (O'Connor, J., concurring). There seems to be considerable agreement on this point. As Justice Marshall noted in dissent, "[w]hat is most important, under any approach to the constitutional analysis, is that a reviewing court genuinely consider the circumstances of the provision at issue." *Id.* at 1862. *See also Hazelwood School Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977) (relevant comparison is "between the racial composition of [the school's] teaching staff and the racial composition ... in the relevant labor market"); *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856–57, 52 L.Ed.2d 396 (1977) ("usefulness [of statistics to establish racial discrimination] depends on all the surrounding facts and circumstances"); *Craig v. Boren,* 429 U.S. 190, 202, 97 S.Ct. 451, 459, 50 L.Ed.2d 397 (1976) ("the statistics exhibit a variety of other shortcomings that seriously impugn their value to equal protection analysis"); *Edinger,* 802 F.2d at 216 (relevant statistical showing is "disparity between the percentage of qualified minority business contractors doing business in [the county] and the percentage of bid funds awarded to those businesses. Defendant's reliance upon general population statistics is especially troubling.").

20. For example, the ordinance imposes stringent requirements for the award of subcon-

tracts. Section 12D.9(b)(1) compels a bidder for a prime construction contract with a city agency to submit a bid that includes MBE and WBE subcontractor participation in percentages equal to or greater than the percentage that the agency has as its goal, usually 30 percent MBE and 10 percent WBE.

21. The Report contains virtually no information as to subcontracts because "[n]o department was requested to submit subcontracting data as part of this report." HRC Rep. 97.

22. Although the Human Rights Commission did not ask the various city departments for subcontracting data, it did choose some construction and architect-engineer (A/E) contracts to monitor. The results seem to confirm that an exclusive focus on prime contracts significantly understates the degree of participation by minority- and women-owned businesses.

### Percentage of Contracting Dollars Awarded to M/WBE's

| | 1981 | | 1982 | |
|---|---|---|---|---|
| | Construction | A/E | Construction | A/E |
| prime | 3.8 | 15.8 | 1.7 | 19.0 |
| sub | 14.3 | 24.0 | 19.3 | 22.7 |

composition of the staff and the racial composition of the student body is irrelevant); *id.* at 1857 (O'Connor, J., concurring); *Edinger,* 802 F.2d at 214–16 (statistical comparison must be with relevant groups, "not merely rely upon general population statistics").

Moreover, we note an inherent difference between Congress and the city, a difference that bears upon the findings on which they each may base remedial action. When Congress adopts a program such as that considered in *Fullilove,* it acts entirely with respect to persons within its jurisdiction because its power extends throughout the United States. The city has authority only over those within its borders; its actions, nevertheless, can have significant spillover effects. Here, for example, the city contracts with individuals and firms based outside San Francisco as imposition of the LBE preference acknowledges. When adopting race-conscious remedies that extend benefits and burdens beyond its territorial boundaries, the city is exercising authority with respect to individuals outside the scope of its legislative purview. If such authority can be sustained, it must be based on very specific findings that actions the city has taken in the past have visited racial discrimination on such individuals.

The findings upon which the ordinance is based do not address this issue; all of the data the city considered pertains to firms within San Francisco. *See, e.g.,* Ordinance § 12D.2(7)(e); HRC Rep. 101. That the city contracts with firms outside its borders seriously undercuts the basis for its conclusions. Contract awards should reflect the pool of available contractors, *not* the city's ethnic makeup. *See* note 17 *supra; Edinger,* 802 F.2d at 215.

Finally, the findings do not support the ordinance's sweeping definition of MBEs as those businesses owned or controlled by "ethnic persons of color including American Indians, Asians (including, but not limited to, Chinese, Japanese, Koreans, Pacific Islanders, Samoans, and Southeast Asians), Blacks, Filipinos and Hispanics." Ordinance § 12D.5. The ordinance and the Human Rights Commission report contains no evidence whatsoever—much less particularized findings—supporting the proposition that each of the listed ethnic groups included in this categorization has been the subject of discrimination.[23] Like the *Wygant* plurality, 106 S.Ct. at 1852 n. 13, we are unable to uphold such a broad classification of who qualifies as a minority for purposes of the city's remedial affirmative action program. *See also Bakke,* 438 U.S. at 309 n. 45, 98 S.Ct. at 2758 n. 45 (opinion of Powell, J.) (inclusion of Asians in special admissions group is "especially curious" in light of substantial number of Asians admitted through regular admissions process). "Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids." *Id.* at 307, 98 S.Ct. at 2757.

### 3. The Means

■ Even if the findings were adequate to support some race-conscious remedies, we would have to consider whether the means adopted by the ordinance are appropriate to that end. Race-conscious distinctions must be narrowly tailored to eliminate the consequences of past discrimination. *See Bakke,* 438 U.S. at 299, 98 S.Ct. at 2752–53 (opinion of Powell, J.); *Paradise,* —— U.S. at ——, 107 S.Ct. at 1066–74 (plurality opinion), at ——, 107 S.Ct. at 1080 (O'Connor, J., dissenting); *Wygant,* 106 S.Ct. at 1850 (plurality opinion); *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2777–78 (opinion of Burger, C.J.); *In re Griffiths,* 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2854–55, 37 L.Ed.2d 910 (1973). "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Fullilove,* 448 U.S. at 537, 100 S.Ct. at 2805 (Stevens,

---

**23.** To the extent that the HRC Report addresses the issue, it seems to support the contrary conclusion. The Report notes that "Asian, Black, and Hispanic contractors represented 96% of the MBE/WBE participation in construction contracts. The underrepresentation of American Indians, Filipinos, and women was apparently due to their extremely limited availability as construction firms." HRC Rep. 99.

J., dissenting). This means that the classification adopted must "'fit' with greater precision than any alternative means." *Wygant*, 106 S.Ct. at 1850 n. 6 (plurality opinion) (citing Ely, *The Constitutionality of Reverse Racial Discrimination*, 41 U.Chi.L.Rev. 723, 727 n. 26 (1974)).

In addition, the remedial program must not impose a disproportionate burden upon few individuals. *See Ohio Contractors Ass'n*, 713 F.2d at 173 (burden must be "reasonable"). In upholding the program in *Fullilove*, the plurality opinion noted as follows:

> The actual "burden" shouldered by nonminority firms is relatively light in this connection when we consider the scope of the public works program compared with overall construction contracting opportunities.[72]

---

[72]The Court of Appeals relied upon Department of Commerce statistics to calculate that the $4.2 billion in federal grants conditioned upon compliance with the MBE provision amounted to about 2.5% of the total of nearly $170 billion spent on construction in the United States during 1977. Thus, the 10% minimum minority business participation contemplated by this program would account for only 0.25% of the annual expenditure for construction work in the United States. *Fullilove v. Kreps*, 584 F.2d at 607.

24. While we consider our holding as entirely consistent with *Paradise*, we note that the Court there may have applied a somewhat more deferential standard of review than we must apply here. Some of the Justices appear to be of the view that when the remedial measures are imposed by a district court in a case where official discrimination is established, "we must acknowledge the respect owed a District Judge's judgment that specified relief is essential to cure a violation of the Fourteenth Amendment." *Paradise*, —— U.S. at ——, 107 S.Ct. at 1073 (plurality opinion); *id.* at ——, 107 S.Ct. at 1077 (noting "the novelty of the suggestion that a test that may be appropriate for determining the constitutionality of state executive or legislative action should also be used in reviewing federal judicial decrees"), and *id.* at ——, 107 S.Ct. at 1079 n. 4 ("remedial issue ... is dramatically different from the question whether a statutory racial classification can be justified as a response to past societal wrong") (Stevens, J., concurring); *but see id.* at ——, 107 S.Ct. at 1075 n. 2 ("[b]ecause racial distinctions are inherently suspect whether they are imposed by a legislature or a court, we have never measured court-ordered affirmative action remedies against a

448 U.S. at 484–85 and n. 72, 100 S.Ct. at 2777–78 & n. 72, *see also id.* at 514–15, 100 S.Ct. at 2793–94 (Powell, J., concurring). In striking down the remedial measures in *Wygant*, the plurality noted this aspect of *Fullilove*, 106 S.Ct. at 1850–51, finding that the burden imposed by the Jackson school board's program fell squarely upon "Wendy Wygant and other individuals who claim that they were fired from their jobs because of their race." *Id.* at 1850 n. 8. In upholding the district court's remedial order in *Paradise*, a plurality of the Justices felt that the decree "did not impose an unacceptable burden on innocent third parties." *Paradise*, —— U.S. at ——, 107 S.Ct. at 1073 (plurality opinion); *id.* at ——, 107 S.Ct. at 1076 ("[t]he effect of the order on innocent white troopers is likely to be relatively diffuse") (Powell, J., concurring).[24]

■ The requirement that the remedial program be drawn so as to avoid a disproportionately large burden on an individual or group of individuals is inherent in the equal protection clause. As the Court has noted, "rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights." *Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S.Ct. 836, 846–47, 92 L.Ed. 1161 (1948). The more severely the burden of governmental

less demanding standard") (Powell, J., concurring).

Giving a district court's decree greater deference makes considerable sense. A district judge, dealing with a specific case, is likely to address problems narrower in scope than a legislature. Moreover, his findings, based on the adversary process, are apt to be much more finely tuned. And, "[t]he district court has first-hand experience with the parties and is best able to deal with the 'flinty, intractable realities of day-to-day implementation of constitutional commands.'" *Paradise*, —— U.S. at ——, 107 S.Ct. at 1074 (plurality opinion) (quoting *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 6, 91 S.Ct. 1267, 1271, 28 L.Ed.2d 554 (1971). *See also Fullilove*, 448 U.S. at 527, 100 S.Ct. at 2800 (Stewart, J., dissenting) (suggesting that a court of equity, unlike a legislature, has the "dispassionate objectivity" and the "flexibility" necessary "to mold a race-conscious remedy around the single objective of eliminating the effects of past or present discrimination") (cited with approval in *Paradise*, —— U.S. at ——, 107 S.Ct. at 1074 n. 34 (plurality opinion).

action falls upon an individual or an identified group singled out on account of race, the more appropriate it becomes for a court to intercede to assure "that the burden ... is precisely tailored to serve a compelling governmental interest. The Constitution guarantees that right to every person regardless of his background." *Bakke*, 438 U.S. at 299, 98 S.Ct. at 2753 (opinion of Powell, J.).

Because the ordinance casts such a wide net,[25] it is difficult to tell whether the burden it imposes is broadly shared as in *Fullilove* and *Paradise*, or concentrated as in *Wygant*. *Fullilove, Wygant* and *Paradise* dealt with discrete activities; the Court there could determine who would be likely to bear the burdens and how such burdens would be distributed. The ordinance here covers a much broader range of activities: whatever the city acquires by purchase or contract. This includes everything from construction and consulting to interpreting and book binding. HRC Rep. 49, 56, 60–61.[26] Depending on the industry in ques-

tion, the degree of minority participation, and the extent to which the city's patronage amounts to a significant share of the market for the particular good or service, the burden imposed by the ordinance will vary.[27] In an industry where city procurement is negligible or MBEs make up a relatively small portion of the market, the burden occasioned by giving MBEs a preference will be spread broadly and lightly. By contrast, a non-MBE business in an industry heavily dependent upon city procurement where MBEs have a significant share of the market may well be destroyed.[28] Nothing in the ordinance prevents this from happening. Yet, given the ordinance's breadth, there is a significant risk that it may.

This concern is properly considered in the context of a facial challenge because the ordinance lacks adequate administrative mechanisms to prevent or ameliorate such potentially harsh results. The existence of appropriate administrative remedies played a pivotal role in the plurality's opinion in

---

**25.** Cases that have approved race-conscious remedies have generally involved a much more limited subject matter. *See, e.g., Fullilove*, 448 U.S. at 484, 100 S.Ct. at 2777–78 (construction contracts); *South Florida*, 723 F.2d at 848 (construction contracts); *Ohio Contractors Ass'n*, 713 F.2d at 168–69 (construction contracts; "contracts for the purchase of equipment, materials, supplies or contracts for the purchase of insurance").

**26.** One need only leaf through the HRC Report for a sampling of the goods and services covered by the city's procurement process: engineering, environmental, graphic arts and insurance services, HRC Rep. 34; legal, accounting and appraisal services, *id.* at 37–38; examinations, *id.* at 40; services of physicians and other health care providers, *id.* at 47–48; bookbinding and book supplies *id.* at 49; counseling, tutoring, crisis intervention and recreational services, *id.* at 49.1; funeral services, *id.* at 53–54; communications and business systems, *id.* at 56; security services, *id.;* microfilm, magnetic tape, hardware, Christmas trees, bus parts, Freon gas, autos and trucks, dryers, pottery, and eggs; police, electric, plumbing, laundry, camera and graphic arts supplies; and garden, office and x-ray equipment, *id.* at 63–66; mailing, typesetting, steam cleaning and respiratory therapy, *id;* and computer systems, *id.* at 71.

In addition, monetary awards were made to a variety of non-profit organizations such as the Boys Club of America, *id.* at 47, and the San Francisco Performing Arts Foundation. *Id.* at

72. The city also awarded franchises. *Id.* at 33, 61. Finally, the city deposited its funds at various banks and savings and loan associations. *Id.* at 71.

**27.** Neither the HRC nor the Board addressed whether MBEs or WBEs in particular industries already received substantial business from the city. The findings do illustrate, however, that the degree of MBE and WBE participation varied considerably from industry to industry. For example, minority firms seem to have done well in the banking industry, with 38.95% of the city's 1981–82 deposits invested in minority-owned banks and savings and loan associations. The following year, a full 80.26% of the city's funds were deposited with MBEs. HRC Rep. 71. In the construction of the George R. Moscone convention center, MBEs received 21% of the prime contracting dollars and 22.22% of the subcontracting amounts. *Id.* at 36.

**28.** A recent national study noted the differences in minority participation between various industries: "Relative to the distribution of all businesses, black-owned businesses are more than proportionately represented in the transportation industry, but considerably less than proportionately represented in the wholesale trade, manufacturing, and finance industries." United States Small Business Administration, *The State of Small Business: A Report of the President Transmitted to the Congress* 201 (1986) (*The State of Small Business*).

*Fullilove.* *See* 448 U.S. at 486–89, 100 S.Ct. at 2778–80. The plurality there noted:

> Even in the context of a facial challenge such as is presented in this case, the MBE provision cannot pass muster unless, with due account for its administrative program, it provides a reasonable assurance that application of racial or ethnic criteria will be limited to accomplishing the remedial objectives of Congress and that misapplications of the program will be promptly and adequately remedied administratively.

*Id.* at 487, 100 S.Ct. at 2779. In determining the adequacy of the available administrative remedies the plurality noted that the procedures could be used to rebut

> [t]wo fundamental congressional assumptions [that] underlie the MBE program: (1) that the present effects of past discrimination have impaired the competitive position of businesses owned and controlled by members of minority groups; and (2) that affirmative efforts to eliminate barriers to minority-firm access, and to evaluate bids with adjustment for the present effects of past discrimination, would assure that at least 10% of the federal funds granted under the Public Works Employment Act of 1977 would be accounted for by contracts with available, qualified, bona fide minority business enterprises.

*Id.*

The *Fullilove* plurality also thought it significant that administrative procedures were available "to avoid dealing with an MBE who is attempting to exploit the remedial aspects of the program by charging an unreasonable price, *i.e.*, a price not attributable to the present effects of past discrimination," *id.* at 488, 100 S.Ct. at 2780, that these procedures give grantees "the opportunity to demonstrate that their best efforts will not succeed or have not succeeded in achieving the statutory 10% target for minority firm participation within the limitations of the program's remedial objectives," *id.*; that "[t]he administrative complaint mechanism allows for grievances of prime contractors who assert that a grantee has failed to seek a waiver in an appropriate case," *id.* at 489, 100 S.Ct. at 2780, and that "the use of racial and ethnic criteria is premised on assumptions rebuttable in the administrative process giv[ing] reasonable assurance that application of the MBE program will be limited to accomplishing the remedial objectives contemplated by Congress and that misapplications of the racial and ethnic criteria can be remedied." *Id.*

While the San Francisco ordinance provides some administrative procedures,[29] they do not have the scope or breadth of those discussed in such detail in *Fullilove.* Aggrieved contractors have no mechanism for asserting that the ordinance's fundamental premises are inapplicable to their industry; that the ordinance will have a harsh and disproportionate impact upon them far exceeding the sharing of the burden approved in *Fullilove;* or that the ordinance is, in particular instances, operating not to eradicate the effects of past discrimination, but to give a windfall to an MBE "who is attempting to exploit the remedial aspects of the program." 448 U.S. at 488, 100 S.Ct. at 2780. We read *Fullilove,* particularly in light of *Wygant,* as requiring concrete assurances that harsh and disproportionate effects upon particular contractors will be considered and corrected by individualized administrative procedures.[30]

**29.** For example, as to certain contracts section 12D.9(B)(2) allows a city agency to apply to the Director for a waiver based on a claim that not enough qualified MBEs or WBEs can be found to provide a particular good or service, and appeal a denial of that waiver to the Human Rights Commission; and section 12D.6(B)(2) contemplates procedures for qualifying businesses as bona fide MBEs, WBEs or LBEs.

**30.** Administrative procedures will be adequate if the decision-making body has the opportunity to consider the appropriateness of awarding each contract on the basis of race-conscious preferences. The "extensive review provisions," 723 F.2d at 854, approved by the Eleventh Circuit in *South Florida* appear to be sufficient. There, the Board of County Commissioners—the very body that passed the challenged ordinance—made a separate determination with respect to every contract before any race-conscious measures were adopted. *Id.* at 853. Moreover, the Board acted only after a county department had

This appears to be entirely lacking in the ordinance before us.[31]

We also conclude that, on the basis of the record it had compiled, the city was not justified in turning to such drastic remedies as bid preferences and set-asides, at least not in the first instance.[32] We must give "particularly intense scrutiny to whether a nonracial approach or a more narrowly tailored racial classification" could remedy the limited participation of minorities in the contracting process. *Wygant,* 106 S.Ct. at 1850 n. 6 (plurality opinion) (quoting Greenawalt, *Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions,* 75 Colum.L.Rev. 559, 578–79 (1975)). The findings on which the ordinance is based disclose a variety of causes for the limited minority participation in the city's procurement process: the lack of uniform criteria for contracting with the city's departments, Ordinance § 12D.2(7)(a); excessive bonding and insurance requirements "often unrelated to actual performance,"

*id.* § .2(7)(1); and lack of notice of potential contract awards due to limited advertising and outreach, *id.* § .2(7)(k).[33]

Each of these problems was capable of a direct, specific response, having far less dramatic effects on individual rights than the remedies actually adopted.[34] Thus, the city could have attempted to correct the lack of uniform policies by adopting procurement guidelines and limiting the scope of departmental discretion. The arbitrary imposition of bonding and insurance requirements could have been eliminated by revising insurance and bonding policies to bring them into conformity with the city's needs. The lack of notice and outreach could have been remedied by increasing the resources devoted to advertising procurement opportunities to groups the city believes are underrepresented in the procurement process. Moreover, it would have been entirely permissible for the city to provide educational programs to acquaint

recommended that "race-conscious measures are appropriate for the project being reviewed," which recommendation had to be approved by the County Manager and a three-member Contract Review Committee. *Id.* These procedures are particularly impressive because the ordinance in *South Florida* addressed only one class of contract, those for construction services. *Id.* at 858. The uncertainty, and the consequential need for case-by-case decision-making, is much greater here, where the ordinance covers a vast array of goods and services. *See* p. 936–937 & note 26 *supra.*

**31.** The administrative procedures the city does provide are both inadequate and misdirected. They are inadequate because requests for waiver can be made only by a city department; there is no mechanism whereby an aggrieved contractor can invoke the administrative relief provided by the ordinance. They are misdirected because they address those situations where the rights of non-MBE contractors are least likely to be impaired: where sufficient MBEs cannot be found to comply with goals and set asides. While San Francisco's administrative procedures serve a useful purpose in safeguarding the city from the ordinance's harsh effects, it does not do the same for those whose rights to equal protection the ordinance might impair.

**32.** In approving the race-conscious remedial decree in *Paradise,* the plurality reasoned that earlier, race-neutral attempts at correcting the problem of official discrimination had proven ineffective. *Paradise,* —— U.S. at ——, 107 S.Ct.

at 1059–64; *see also id.* at ——, 107 S.Ct. at 1075 (defendant had "repeatedly failed to carry out court orders") (Powell, J., concurring). On the basis of this history, the plurality concluded that "it is doubtful ... that the District Court had available to it any other effective remedy." *Id.* at ——, 107 S.Ct. at 1070 (quoting *Sheet Metal Workers v. EEOC,* 478 U.S. ——, ——, 106 S.Ct. 3019, 3056, 92 L.Ed.2d 344 (1986)). The plurality also noted that "[s]ome promptness in the administration of the relief was plainly justified ... and use of deadlines or end-dates had proven ineffective." *Paradise,* —— U.S. at ——, 107 S.Ct. at 1071.

**33.** The HRC Report listed similar problems: "lack of prompt payment; the need for technical assistance to MBE/WBEs; lack of availability of information on procedures used to choose consultants." HRC Rep. 91–92.

**34.** We have no quarrel with the Sixth Circuit's observation that "there is no requirement that the least restrictive means be chosen." *Ohio Contractors Ass'n,* 713 F.2d at 174. *See also Paradise,* —— U.S. at ——, 107 S.Ct. at 1073 (least restrictive means not required); *but see Wygant,* 106 S.Ct. at 1850 n. 6 (plurality opinion). The city has a broad range of options available to it from which it may choose freely. However, if it wishes to resort to race-conscious remedies, it must show a necessity for doing so; this normally means that other remedies have been given a fair try and have proved ineffective. That was the situation in *Ohio Contractors Association. Id.* at 174, 176.

minority and other businesses with city contracting opportunities and the procedures required for preparing and submitting bids.[35]

We do not hold that the city is forever limited to such moderate remedial measures. We do read the admonition that only a "limited and properly tailored remedy" may be adopted, *Fullilove*, 448 U.S. at 484, 100 S.Ct. at 2778 (opinion of Burger, C.J.), as requiring exhaustion of more neutral measures before resorting to race-conscious ones.[36] That is what happened in *Fullilove*. Before passing the statute there in issue the federal government had tried less sweeping remedies only to see them fail. *Id.* at 466–67, 100 S.Ct. at 2768–69.[37] In attempting to protect and reconcile the sometimes conflicting rights and interests of all its citizens, the city must do no less.

## B. The WBE Preferences

Laws that afford special privileges to women raise some of the most difficult and sensitive questions about the permissible bounds of governmental action within the confines of the equal protection clause. The mid-level review that the Court has applied to such classifications provides "relatively little guidance in individual cases." *Madisonian Interpretation*, 91 Yale L.J. at 1412.[38] The relevant considerations are numerous and complex.

As the San Francisco City Council found, women have suffered disparate treatment in the area of business and employment. Some of this may be due to the fact that women, as child-bearers, suffer career disruptions to which men are much less subject. However, many of the disadvantages women have suffered result from stereotypes concerning their proper roles and abilities.[39] Only recently have women be-

---

**35.** The HRC Report suggested several such options, including "[e]stablishment of a City Liaison Office staffed by minorities and women; ... training seminars for City staff awarding prime contracts; ... breaking down large prime contracts into smaller components; ... an overall central office listing *all bids* and *Requests for Proposals* pending and current...." HRC Rep. 92 (emphasis original). Many of these measures were enacted along with the quotas and preferences. *See, e.g.,* Ordinance §§ 12D.8 (A), (B)(7).

**36.** The HRC Report suggests that race-neutral measures can be effective. It notes that "[g]enerally, the departments with which the HRC has work order funding to monitor and implement affirmative action progress ... have significantly higher MBE and WBE participation than those with which the HRC does not have such a relationship." HRC Rep. 96. Such measures also appear to be working well in Santa Clara, a community near San Francisco. Bunzel, *Helping Minority Firms, Hurting No One*, Wall St. J., September 12, 1986, at 24, col. 4. Santa Clara County's MBE program includes a countywide listing of all MBE firms and a requirement that a certain percentage of a project's total value be procured from them. However, the requirement need not be met if a contractor shows it (a) contacted seven MBE or WBE firms (if that many are on the county's list); and (b) none of those contacted submitted the lowest bid. "The county has not assumed ... that it has a responsibility to assist MBEs and other small business to develop their capabilities by subsidizing them through limiting the award of contracts only to such firms. [The] real goal is to go out to those groups and get an honest bid back." *Id.* at cols.

5–6. Over the past ten years of the program's existence, the result has been a significant increase in the dollar value of contracts awarded to MBEs and substantial savings to the county, since its "undeviating policy" is that contracts go to the lowest responsive bidder. *Id.* at col. 6.

**37.** As noted above, this was also the situation confronted by the Court in *Paradise*. *See* note 32 *supra*.

**38.** Borrowing a phrase from another area of constitutional law, the Court's opinions in the area of gender discrimination have involved "essentially ad hoc, factual inquiries" into the particular circumstances of each program. *See MacDonald, Sommer & Frates v. Yolo County*, —— U.S. ——, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986).

**39.** An 1875 decision of the Wisconsin Supreme Court, denying a woman admission to its bar, captures the essence of this thinking. The court there stated:

> The law of nature destines and qualifies the female sex for the bearing and nurture of the children of our race and for the custody of the homes of the world and their maintenance in love and honor.... There are many employments in life not unfit for female character. The profession of law is surely not one of these. The peculiar qualities of womanhood, its gentle graces, its quick sensibility, its tender susceptibility, its purity, its delicacy, its emotional impulses, its subordination of hard reason to sympathetic feeling, are surely not qualifications for forensic strife.

gun to assume their rightful place in business and the professions.[40]

As the Court has recognized, government may lawfully promote this progress. *See, e.g., Schlesinger v. Ballard,* 419 U.S. 498, 508, 95 S.Ct. 572, 577–78, 42 L.Ed.2d 610 (1975) (women officers given additional time to achieve promotion because they are barred from combat duty and therefore do not have the same promotional opportunities as do men); *Califano v. Webster,* 430 U.S. 313, 318, 97 S.Ct. 1192, 1195, 51 L.Ed.2d 360 (1977) (because the market is inhospitable to women seeking higher paying jobs, their retirement benefits may be computed by a more generous formula than that applicable to men). Government has the broad power to assure that physical differences between men and women are not translated into permanent handicaps, and that they do not serve as a subterfuge for those who would exclude women from participating fully in our economic system.

■ But there are dangers. A thin line divides governmental actions that help correct the effects of invidious discrimination from those that reinforce the harmful notion that women need help because they can't make it on their own. It is in part for this reason that the Court has required an "exceedingly persuasive justification" for

classifications based on gender. *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982); *Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981); *Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979). While helping women overcome the adverse effects of discrimination is a sufficiently important objective to justify the limited use of gender-based classifications, "the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975). The city may invoke a compensatory purpose to justify a discriminatory classification "only if members of the gender benefited by the classification actually suffer a disadvantage related to the classification." *Id.* Moreover, the classification must not reflect or reinforce archaic and stereotyped notions of the roles and abilities of women. 458 U.S. at 724–25, 102 S.Ct. at 3336.

The San Francisco ordinance seeks to compensate women for the disparate treatment they have suffered in the business community and for the bureaucratic inertia

*In re Lavinia Goodell,* 39 Wisc. 232, 245 (1875). *See also Bradwell v. State,* 83 U.S. (16 Wall) 130, 141, 21 L.Ed. 442 (1872) ("[t]he natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life").

**40.** The last 10–15 years have marked a dramatic increase in women's participation in business and the professions. From 1977–1983 the number of women-owned businesses increased at an average annual rate more than twice that of men-owned businesses. *The State of Small Business, supra* note 28, at 151 & Table A.1. In terms of receipts, women-owned businesses grew at almost three times the annual rate of men-owned businesses. *Id.* at 151. These increases occurred in all major industries. *Id.* at 161 & Tables A.8, A.20. The statistics on the number of women affected by this trend are also impressive: "[B]etween 1979 and 1983, the number of unincorporated self-employed women increased five times faster than the number of self-employed men, and more than three times as fast as women wage-and-salary workers." *Id.* at 122.

These trends seem destined to continue. In the last 15 years, the percentage of bachelor degrees in business management granted to women has increased more than 300 percent. The increase in the percentage of advanced business degrees awarded to women is even more dramatic: a 641 percent increase in masters degrees and a 500 percent increase in doctorates. Commission on Professionals in Science and Technology, *Professional Women & Minorities* 65, Table 3–16 (6th ed. 1986).

There has been similar progress in the professions. In 1982–83, women received 36.2 percent of first law degrees, almost ten times the percentage in 1947; and 34.8 percent of architecture degrees, as compared to 12.2 percent in 1947. In 1984–85, women received 19.9 percent of first dental degrees, almost a ten-fold increase over the percentage 40 years earlier; and 30.1 percent of medical degrees, three times the percentage in 1947. *Id.* at 57, Table 3–3. Over the last decade alone, the percentage of women receiving doctorates in the professional fields has more than doubled. *Id.* at 56, Table 3–2.

in the city's contracting procedures that has perpetuated the disadvantages flowing from that treatment. The ordinance states that women have been subjected to "historical discrimination" that has had "a serious, negative impact on their ability to participate fully and equitably in our society," Ordinance § 12D.2(1), and that they have suffered "centuries of limited access to the marketplace ... because of the failure of local government[] ... to remedy overt and subtle discrimination." *Id.* § .2(2). The ordinance recognizes the disadvantages women suffer because of the city's lack of uniform standards and excessive departmental discretion in awarding contracts; the disproportionate burden they must bear because of excessive bonding and insurance requirements; and the reduced access to city contracts they have because of limited advertising. *See id.* § .2(7).

The ordinance seeks to remedy these hardships by giving women an advantage in securing contracts with the city. While this objective is plainly an important and legitimate one, we think it a much closer question whether the means employed are "substantially related to [its] achievement." *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980). The ordinance is unusual in the breadth of the subsidy it gives women. Earlier cases, for the most part, considered relatively narrow remedies directed at relatively specific areas of disadvantage, *see, e.g., Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (opportunities for promotion in armed forces); *Michael M. v. Superior Court,* 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (statutory rape statute that applied only to males in order to protect women); *Clark v. Arizona Interscholastic Ass'n,*

695 F.2d 1126 (9th Cir.1982) (policy of sponsoring interscholastic volleyball teams exclusively for girls), *cert. denied* 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983). By contrast, the San Francisco ordinance gives women an advantage in a large number of businesses and professions. We have no reason to believe that women are disadvantaged in each of the many different industries covered by the ordinance. Experience teaches the contrary. *See Hogan,* 458 U.S. at 729, 102 S.Ct. at 3338–39 ("Mississippi has made no showing that women lacked opportunities to obtain training in the field of nursing or to attain positions of leadership in that field").[41]

Moreover, preferences as broad as these can reinforce harmful stereotypes. *See Bakke,* 438 U.S. at 298, 98 S.Ct. at 2752 ("preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection") (opinion of Powell, J.). This risk is magnified where the preferences are not accompanied by particularized findings of harm, and where they extend to areas where women have not been found to be disadvantaged. The notion that women need help in every business and profession is as pernicious and offensive as its converse, that women ought to be excluded from all enterprises because their place is in the home. *See note 39 supra.*

■ Although we find the city's WBE preference troubling, we uphold it against the challenge presented in this case. While the city's program may well be overinclusive, we believe it hews closely enough to the city's goal of compensating women for disadvantages they have suffered so as to survive a facial challenge. Unlike racial

---

**41.** The available data indicate that women's participation varies greatly from industry to industry. For example, as of 1980, women comprised only 6.4 percent of the nation's mechanical engineers and only 8.5 percent of surveyors. *Professional Women & Minorities, supra* note 40, at 193, Table 7–33. In other industries the degree of participation was much higher. For example, in 1980 women constituted 96 percent of registered nurses, *id.* at 225, Table 8–51; 63 percent of social workers, *id.* at 234, Table 9–4;

and 42 percent of biological technicians, *id.* at 193, Table 7–33. Recent growth rates in women-owned businesses, *see* note 40 *supra,* have been highest in those industries where women have not traditionally participated—manufacturing, construction and agricultural services. Between 1977 and 1983, receipts for women-owned businesses posted their single largest increase in the construction industry. *The State of Small Business, supra* note 28, at 161–62.

classifications, which must be "narrowly" tailored to the government's objective, *e.g.*, *Wygant*, 106 S.Ct. at 1850 (plurality opinion); *Fullilove*, 448 U.S. at 480, 100 S.Ct. at 2775–76 (opinion of Burger, C.J.), there is no requirement that gender-based statutes be "drawn as precisely as [they] might have been." *Michael M.*, 450 U.S. at 473, 101 S.Ct. at 1206 (1980) (plurality opinion). Although the city's program may extend preferences to some fields where women are not disadvantaged, experience suggests that these are still the exceptions. *See generally Professional Women & Minorities, supra* note 36, at 54–265. In most fields, the requirement that the gender benefited "actually suffer a disadvantage related to the classification" will be satisfied. *Hogan*, 458 U.S. at 728, 102 S.Ct. at 3338. The WBE program is therefore *substantially* related to the city's important goal of compensating women for the disparate treatment they have suffered in the marketplace. *Id.* at 724, 102 S.Ct. at 3336.

We may reach a different conclusion if and when the WBE preferences are challenged as applied to an industry where women are not disadvantaged. While governmental action, particularly where it is plainly remedial in character, need not operate with surgical precision, there must be strong assurances that it is not merely the result of patronizing assumptions about the status and abilities of women, but an attempt to provide assistance where it is needed and warranted. The city may not close its eyes to the rich texture of our economic landscape and ignore the very real differences in the status of women in various businesses and professions, *see* note 41 *supra;* nor may it ignore the substantial progress women have made and continue to make in business and the professions. *See* note 40 *supra.*

As the ordinance found, fully 25 percent of businesses within the City of San Francisco are owned by women and 45 percent of the civilian work force is female. Ordinance §§ 12D.2(7)(e), 12D.2(3). These numbers may not be distributed homogeneously

and, in some industries, women may have reached or exceeded parity with men. It is unlikely that the city could demonstrate an "exceedingly persuasive justification" for giving women a preference in such industries. Equally important, in some industries the participation of women may be so high that encouraging further participation may well reinforce harmful stereotypes, defeating, rather than promoting, the cause of gender equality. *See Hogan*, 458 U.S. at 729, 102 S.Ct. at 3338–39 ("[r]ather than compensate for discriminatory barriers faced by women, [Mississippi's] policy of excluding males from admission to the School of Nursing tends to perpetuate the stereotyped view of nursing as an exclusively woman's job"). We leave these matters to another day. We note only that such challenges, if raised, are not precluded by our decision today.

### C. The LBE Preference

Appellants' final contention is that the ordinance's LBE preferences are unconstitutional because they seek to promote domestic businesses at the expense of nonresident competitors. The only precedent they cite is *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985). *Metropolitan* considered an Alabama statute that placed a heavier tax burden on premiums collected by out-of-state insurance companies than those collected by insurance companies incorporated within the state. The state argued that this statute served legitimate purposes: (1) encouraging the formation of new insurance companies within the State; and (2) promoting capital investment in certain state assets and securities. *Id.* at 873, 105 S.Ct. at 1679. The Court struck down the provision, holding that these purposes could not be advanced by burdening foreign businesses competing with domestic ones.[42] What seemed to trouble the Court was that the Alabama tax had no other function than to give domestic businesses an advantage over their foreign competitors. The Court noted:

---

**42.** While *Metropolitan* seemed to say that the purposes themselves were not legitimate, *see* 470 U.S. at 882, 105 S.Ct. at 1683–84, it is quite clear that the Court was concerned with means at least as much as with ends, perhaps more.

A State's natural inclination frequently would be to prefer domestic businesses over foreign. If we accept the State's view here, then any discriminatory tax would be valid if the State could show it reasonably was intended to benefit domestic business.

Id. at 882, 105 S.Ct. at 1683–84 (footnote omitted).

■ The LBE preference in the San Francisco ordinance is readily distinguishable from Alabama's premium tax struck down in *Metropolitan.* Unlike the statute in *Metropolitan,* the ordinance in this case affects only the expenditure of public funds. The city's power to spend its funds as it pleases is not limitless, as the previous portions of this opinion demonstrate. However, the city may rationally allocate its own funds to ameliorate disadvantages suffered by local business, particularly where the city itself creates some of the disadvantages.[43]

■ In addition, the LBE preference is not a burden imposed "discriminatorily ... on nonresident corporations solely because they are nonresidents," *id.* at 882 n. 10, 105 S.Ct. at 1684 n. 10, it is an attempt to remove or to lighten a burden San Francisco businesses must bear that is not shared by others. While the distinction is a fine one, and our ruling should not be read as granting constitutional immunity to all local preferences so long as they can be characterized in this fashion, we believe that the combination of ends and means employed by the city here falls well within the discretion permitted to it under the equal protection clause.

Two of the ordinance's findings are relevant to this issue. The first notes that "local businesses which seek to enter into contracts with the City and County of San Francisco are at a competitive disadvantage with businesses from other areas because of the higher administrative costs of doing business in the City (e.g. higher taxes, higher rents, higher wages and benefits for labor, higher insurance rates, etc.)." Ordinance § 12D.2(4). The second is that "the public interest would best be served by encouraging businesses to locate and remain in San Francisco through the provision of a minimal 'good faith' preference to local businesses in the awarding of City contracts." *Id.* § .2(5). Both of these are legitimate considerations. And, as the Supreme Court has recognized, it is generally legitimate for a governmental entity to encourage businesses to move into the jurisdiction. *Metropolitan,* 470 U.S. at 879, 105 S.Ct. at 1682, *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 532–33, 79 S.Ct. 437, 443–44, 3 L.Ed.2d 480 (1959) (Brennan, J., concurring).

As *Metropolitan* demonstrates, however, seemingly legitimate ends are tainted if they are pursued by illegitimate or excessive means. Here the means adopted are both measured and appropriate. The preferences given local businesses are relatively slight. LBEs get only a 5 percent bidding preference; there are no goals, quotas or set-asides. Moreover, the preference does not apply to all business transactions conducted within the jurisdiction, only those where the city itself is a party. Finally, the definition of LBE is rather broad;[44] foreign businesses can become LBEs by acquiring "fixed offices or distribution points" within the city and paying their permit and license fees from a San Francisco business address. Thus, any business willing to share some of the burdens of a San Francisco location—higher rents, wages, insurance premiums, etc.—

---

**43.** *Cf. United Building & Construction Trades v. Mayor of Camden,* 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (holding that the city has a vital interest in "analyzing local evils and in prescribing appropriate cures," but distinguishing public employment from employment with contractors engaged in public contract work, for purposes of the privileges and immunities clause of Article IV.)

**44.** An LBE is defined as follows:

[A] business firm with fixed offices or distribution points located within the boundaries of the City and County of San Francisco and listed in the Permits and License Tax Paid File with a San Francisco business street address. Post Office box numbers or residential addresses may not be used solely to establish status as a "Local Business".

Ordinance § 12D.5.

can enjoy the benefits of the LBE preference. We see no constitutional infirmity in the city's modest attempt to support local businesses and to induce other businesses to move there.

### Conclusion

We hold as follows:

(1) With respect to contracts over $50,-000, all of the ordinance's preferences are invalid insofar as they would result in the award of contracts to other than the "lowest reliable and responsible bidder." However, the LBE preference is valid as to any contracts covered by San Francisco Charter section 7.204.

(2) With respect to contracts of $50,000 or less: (a) those provisions of the ordinance giving preferences to MBEs are void as violating the equal protection clause; (b) those provisions giving preferences to WBEs are facially valid but subject to further challenge as applied to particular contracts and industries; and (c) all other portions of the ordinance, in particular the 5 percent bid preference given to LBEs, are valid.

We remand to the district court for entry of a decree in accordance with this opinion.