**J. EDINGER AND SON, INC. and Dealers Truck Equipment, Inc., Plaintiffs-Appellees,**

v.

**The CITY OF LOUISVILLE, KENTUCKY, Defendant-Appellant.**

**No. 85–6057.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 7, 1986.

Decided Oct. 1, 1986.

Frank X. Quickert, Jr., Mark W. Dobbins (argued), Louisville, Ky., for defendant-appellant.

James C. Hickey (argued), Louisville, Ky., for plaintiffs-appellees.

Before ENGEL and GUY, Circuit Judges, and SUHRHEINRICH, District Judge.*

SUHRHEINRICH, District Judge.

Defendant appeals from the granting of plaintiffs' motion for summary judgment

---

* Honorable Richard F. Suhrheinrich, United States District Judge for the Eastern District of Michigan, sitting by designation.

by the United States District Court for the Western District of Kentucky. The district court declared the City of Louisville Ordinance 136, Series 1983 (Minority Vendors Ordinance) unconstitutional and, thus, enjoined the enforcement of the provisions of the ordinance. We affirm.

## FACTS

Under the terms of the ordinance, businesses which are majority owned by certain minority groups are accorded a preference in bidding on supply and service contracts with the City of Louisville. The ordinance applies to businesses which are majority owned by the following minority groups: racial minorities which comprise at least 2% of the population of Jefferson County, Kentucky, women, and handicapped persons.

The preference is applied so that if· the dollar volume of expenditures by the City awarded to businesses majority owned by any of the minority groups does not reach a specified percentage in a given year, the following year, businesses majority owned by that group shall receive a five percent credit on all bids which it submits to the City. The specified percentages are twenty percent to racial minorities, five percent to females, and three percent to the handicapped. For example, if the dollar volume of expenditures by the City on its contracts to businesses majority owned by blacks does not reach 20% of the total expenditures by the City in a given year, the following year black owned businesses will receive a 5% credit on all bids to the City. Once these threshold percentages are met, the credits cease until the total expenditure percentages again fall below the threshold percentages.

The avowed purpose of the City's statute is "the correction of unequal opportunities historically generated and made available to minority, female, and handicap contractors and vendors". The City concluded that unequal opportunities existed because while Jefferson County was 54% female and 28% black, less than one percent of the dollar volume of the City's business in 1982 was awarded to minority, female, and handicapped owned businesses, respectively. These general population statistics were the sole basis for the ordinance.

Plaintiffs are corporations majority owned by white, non-handicapped males. They presented an Equal Protection Clause challenge to Ordinance 136 which the district court considered upon cross motions for summary judgment. The district court concluded that it was not improper for the City of Louisville to identify areas of past discrimination and then enact legislation to remedy it. However, the district court held that the City can enact such legislation only when there is sufficient proof of discrimination. In this case, the district court held that it was unconstitutional to conclude that discrimination occurred solely because the business operation distribution did not equate with the general population distribution. Further, the district court found the ordinance unconstitutional because it lacked a durational limitation. It concluded that a reevaluation or reassessment system was necessary so that the legislation would last no longer than required to remedy the past discriminatory treatment.

## DISCUSSION

■ Defendant-appellant challenges the district court's conclusion that there was an insufficient statistical basis to justify the racial classification. The district court concluded:

> The Court's problem comes from the Board's conclusion that since about 28% of Louisville's population is black, it follows that 20% of the contractors with the City are black owned. Similarly, the Court is troubled by the fact that about 52% of Louisville's population is female. That figure will not support the conclusion that 52% of the businesses are owned by females.
>
> \*    \*    \*    \*    \*    \*
>
> There is nothing in the record to support a finding that 20% of the businesses which contract with the City are owned by blacks or that 5% are owned by wom-

en or that 3% are owned by handicapped individuals.... The relief which the ordinance seeks to authorize is available only on proof or an admission of intentional discrimination, a showing which has not been made. See *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 2590, 81 L.Ed.2d 483 (1984).

Defendant maintains that the large discrepancy between the percentage of minority residents and the percentage of business conducted with minority owned businesses sufficiently demonstrates a need for the legislation. We agree with the district court.

Although general population figures have been used to determine whether racial discrimination occurred in a particular area of the work force (see, *e.g., Bratton v. City of Detroit,* 704 F.2d 878 (6th Cir.1983)), that analysis is not applicable here. In *Bratton,* this court allowed the use of general population figures to determine if racial discrimination occurred within the Detroit Police Department. However, in *Bratton,* unlike here, there was sufficient information from which to infer intentional discrimination. First, the court noted that there existed a long history of racial discrimination in the police department. Here, there is no evidence of such a history. Second, the court noted that the history of this discrimination was corroborated by numerous independent studies, including reports of the Michigan Civil Rights Commission, the 1968 report of the National Advisory Committee on Civil Disorders, and the 1967 report of the President's Crime Commission. Last, the court relied on recent statistics showing a disparity between the representation of blacks on the police force relative to blacks in the general population. These statistics were appropriate in *Bratton,* because police force applicants come from the general populace. Here, however, business contractors bid on city contracts, not individual members of the general population. Thus, a more appropriate analysis would have focused on the number of minority owned contractors

in the county rather than the number of minorities *per se.*

Appellant also relies heavily upon *Ohio Contractors v. Keip,* 713 F.2d 167 (6th Cir.1983), where this court upheld the validity of an Ohio law requiring state officials to set aside a percentage of state contracts for bidding exclusively by minority businesses. However, *Keip,* is readily distinguishable. In *Keip,* the Ohio General Assembly compared specific figures of the percentage of funds awarded to minority businesses to the percentage of total minority businesses in the marketplace. Thus, unlike here, *Keip* compared the relevant groups and did not merely rely upon general population statistics.

Appellant also argues that this case is indistinguishable from *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), where a plurality of the Supreme Court upheld a Congressional program requiring 10% of federal grants for local public works projects funded by the enterprise provision of the Public Works Employment Act of 1977 be set aside for minority business enterprises. Again, the legislative body in *Fullilove* considered substantial evidence proving discrimination which was not considered by the Board of Aldermen of the City of Louisville. Congress had evidence of a marked disparity in the percentage of public contracts awarded to minority business enterprises and those awarded to non-minority business enterprises. After full scale hearings, Congress aptly concluded that the disparity resulted not from any lack of qualified minority businesses, but from the existence and maintenance of barriers to competitive access. *Fullilove* is distinguishable in two respects. First, Congress properly analyzed statistics focusing on minority business enterprises rather than relying on general population statistics. Second, the extensive hearings by Congress produced other evidence corroborating the finding of intentional discrimination. In contrast, the hearings of the Board of Aldermen simply rehashed the statistical disparity between the population distribution and the business operation distribution. No other evidence of discrimination was presented.

A recent Supreme Court decision supports this court's decision. *Wygant v. Jackson Board of Education,* —— U.S. ——, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality opinion), involved the retention of black, non-tenured teachers while laying off white, tenured teachers to maintain a racial balance called for by an affirmative action plan. The disproportionately low number of black teachers relative to the number of black students was thought to be evidence of prior discrimination. The Court held the legislation was unconstitutional because no finding of prior discrimination had ever been made. Specifically, the Court found:

> [A] public employer like the Board must insure that, before it embarks on an affirmative action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination.
>
> Evidentiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees.

*Id.* 106 S.Ct. at 1848.

As a guideline for determining prior discrimination, the Court noted:

> This Court's reasoning in *Hazelwood School District v. United States,* 433 U.S. 299 [97 S.Ct. 2736, 53 L.Ed.2d 768] (1977), illustrates that the relevant analysis in cases involving proof of discrimination by statistical disparity focuses on those disparities that demonstrate such prior governmental discrimination.... [T]he proper comparison for determining the existence of actual discrimination by the school board was "between the racial composition of [the school's] teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market".

*Wygant,* 106 S.Ct. at 1847.

■ Application of those guidelines to the case at bar clearly shows that the City's reliance upon general population statistics cannot withstand an equal protection challenge. The City is required to show some statistical disparity between the percentage of qualified minority business contractors doing business in Jefferson County and the percentage of bid funds awarded to those businesses. Defendant's reliance upon general population statistics is especially troubling given that bid systems, by definition, are inherently non-discriminatory. Thus, the City should be required to present evidence of invidious discrimination.

The Board of Aldermen has simply assumed that the disparity between the percentage of minorities in the county and the percentage of minority owned businesses contracting with the city is due to discrimination. This assumption has not been supported by any proof. Defendant has not shown that minority businesses which submitted the low bid have been denied the contract. Defendant has not shown that minority applicants were being excluded from the bid pool. Defendant has not even shown that any qualified minority owned businesses existed. Without any proof of discrimination, this court refuses to sanction discrimination against innocent non-minority businesses.

■ Defendant suggests that minority owned businesses have been unable to develop because of discrimination and, thus, the bid credit is necessary to encourage minorities to pursue such businesses. Again, however, there is no showing that actual discrimination has stunted the development of minority businesses. There are a host of social, economic, personal, and demographic factors which may account for the statistical disparity. Even assuming defendant was able to show that societal discrimination has caused a disproportionately small number of minority owned contractors, this is still an insufficient basis for imposing a racially classified remedy against innocent people. As stated in *Wygant,* 106 S.Ct. at 1842:

> Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy. The role model theory typifies this indefiniteness. There are numerous explanations for a disparity between the percentage of mi-

nority students and the percentage of minority faculty, many of them completely unrelated to discrimination of any kind. In fact, there is no apparent connection between the two groups.... [A]s the basis for imposing discriminatory legal remedies that work against innocent people, societal discrimination is insufficient and overexpansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.

For the above reasons, we agree with the trial court that the evidence relied upon to justify the ordinance was insufficient to grant a racial preference.

Appellant also challenges the district court's finding that the ordinance is unconstitutional because it lacks a durational limitation. However, because we have already found the ordinance unconstitutional, this second issue is moot.

### CONCLUSION

In accordance with the above opinion, the judgment of the district court is AFFIRMED.