822 F.2d 1355
 43 Empl. Prac. Dec. P 37,215, 56 USLW 2050,
34 Cont.Cas.Fed. (CCH) 75,331
 J.A. CROSON COMPANY, Appellant,
v.
CITY OF RICHMOND, Appellee,
Associated General Contractors of America, Amicus Curiae.
J.A. CROSON COMPANY, Appellee,
v.
CITY OF RICHMOND, Appellant,
Associated General Contractors of America, Amicus Curiae.
 Nos. 85-1002, 85-1041.
 United States Court of Appeals,
Fourth Circuit.
 July 9, 1987.
Rehearing and Rehearing En Banc Denied Sept. 18, 1987.
 
 Walter H. Ryland (Williams, Mullen & Christian, Richmond, Va., on brief), for appellant/cross-appellee.
 Reginald M. Barley, Sr. Asst. City Atty. (Michael L. Sarahan, Asst. City Atty., Richmond, Va., on brief), for appellee/cross-appellant.
 Michael E. Kennedy, McLean, Va., for amicus curiae.
 Before HALL, SPROUSE, and WILKINSON, Circuit Judges.
 WILKINSON, Circuit Judge:
 
 
 1
 This case is now before us on remand from the Supreme Court. It involves a challenge to the Minority Business Utilization Plan enacted by the City Council of Richmond, Virginia. The plan requires contractors on city construction projects to subcontract at least thirty percent of the dollar value of the contract to minority-owned business enterprises (MBE's) unless the city waives the requirement. This court earlier upheld the plan under Virginia law and the federal Constitution.
 
 
 2
 The Supreme Court granted certiorari, vacated the judgment, and remanded the case for consideration in light of Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). We now hold that the Richmond plan is invalid under the Equal Protection Clause of the Fourteenth Amendment.
 
 I.
 
 3
 The Minority Business Utilization Plan, enacted in April of 1983, sets aside part of the city's construction expenditures for minority-owned businesses. The plan terminates in 1988, at which time the City Council can renew it or allow it to lapse. Under the plan, the prime contractor must subcontract at least thirty percent of the dollar value of the contract to firms that are at least one-half minority owned. Every construction contract includes provisions setting out the MBE requirement and the procedures for complying with it. The contract provisions state that if a contractor fails to meet the MBE requirement, the contract "shall be suspended or terminated unless a waiver is granted." They further state that the city will not waive the requirement "other than in exceptional circumstances." Only non-minority prime contractors must comply with the plan provisions.
 
 
 4
 In September of 1983, the city invited bids for the installation of stainless steel urinals and water closets at the City Jail. The J.A. Croson Co., which is not itself an MBE, was the only bidder on the contract. After Croson submitted its bid for the project, it requested a waiver of the MBE requirement. Croson contended that it was unable to locate any minority subcontractors, except one that it considered unqualified. The city refused to grant a waiver. Croson then informed the city that if it were required to use the unqualified contractor, the cost of the project would rise by $7,663.16, and the contract price would have to rise accordingly. The city again turned Croson down, stating that the minority contractor was qualified and that the fixed price bid could not be increased.
 
 
 5
 Shortly thereafter, the city informed Croson that it had decided to re-bid the project. Croson was invited to submit a new bid. Croson then sued in federal district court, arguing that the plan's racial set-aside was contrary to Virginia law governing competitive bid procedures and that it violated the federal Constitution. Croson brought its federal claims under 42 U.S.C. Secs. 1981 and 1983.
 
 
 6
 The district court ruled that the plan was consistent with both Virginia law and federal law. A divided panel of this court affirmed. J.A. Croson Co. v. City of Richmond, 779 F.2d 181 (4th Cir.1985). After this court announced its decision, the Supreme Court decided Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). The Supreme Court granted certiorari in the Croson case and remanded it to us for further consideration in light of Wygant. See --- U.S. ----, 106 S.Ct. 3327, 92 L.Ed.2d 733 (1986).
 
 
 7
 Wygant involved a challenge to a preferential layoff provision in a collective bargaining agreement for school teachers. The agreement stated that if the Board of Education needed to lay off any teachers, those with the most seniority would be protected, "except that at no time will there be a greater percentage of minority personnel laid off than the current percentage of minority personnel employed at the time of the layoff." 106 S.Ct. at 1845. The Court held this provision unconstitutional, principally because the racial preference was not justified by adequate findings of prior discrimination and because it was not narrowly tailored to its asserted remedial purpose.
 
 
 8
 After reconsidering our decision in light of Wyqant, we conclude that we must invalidate the racial preference in the Richmond plan. The very infirmities which marked the preferential provision in Wygant are present in this case.
 
 II.
 
 9
 Because the views of the majority in Wygant were expressed in a plurality opinion and two concurrences, the boundaries of Wygant will no doubt be a matter of dispute.[1] There should be no dispute, however, about the core of its holding: To show that a plan is justified by a compelling governmental interest, a municipality that wishes to employ a racial preference cannot rest on broad-brush assumptions of historical discrimination. Yet that is exactly what the Richmond City Council did in this case. If this plan is held to be valid, then local governments will be free to adopt sweeping racial preferences at their pleasure, whether those preferences are legitimate remedial measures or bald dispensations of public funds and employment based on the politics of race. It is precisely to guard against this latter abuse that the Wygant requirement of particularized findings is essential.
 
 A.
 
 10
 According to the Wygant plurality, before an asserted governmental interest in a racial preference can be accepted as "compelling," there must be findings of prior discrimination. Findings of societal discrimination will not suffice; the findings must concern "prior discrimination by the government unit involved " (emphasis added). Wygant, 106 S.Ct. at 1847. Moreover, if this finding is to be drawn from mere statistical evidence, that evidence cannot just show a disparity between the percentage of minorities in some activity (e.g., employment in public schools or awarding of public contracts) and the percentage of minorities in the community. It must instead focus on the population that is relevant for comparative purposes, such as the percentage of minorities in the local labor force or the construction business. Id. at 1847-48; see also Johnson v. Transportation Agency, Santa Clara County, --- U.S. ----, 107 S.Ct. 1442, 1452, 94 L.Ed.2d 615 (1987); Hazelwood School District v. United States, 433 U.S. 299, 308 & n. 13, 97 S.Ct. 2736, 2742 & n. 13, 53 L.Ed.2d 768 (1977).[2]
 
 
 11
 The Supreme Court in United States v. Paradise, --- U.S. ----, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) and Local 28 of Sheet Metal Workers v. EEOC, --- U.S. ----, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986), reemphasized this need for a suitable basis for remedial action. In both of these cases, the Court upheld race-conscious relief imposed by district courts where the offending institutions had a history of discriminatory conduct. In Paradise, for example, the Court reviewed that institutional history in painstaking detail, noted the "four decades" during which blacks had suffered total exclusion from all positions in the Alabama Department of Public Safety, and concluded that the "pervasive, systematic, and obstinate discriminatory conduct of the Department" justified the race-conscious relief ordered by the district court. 107 S.Ct. at 1065 (opinion of Brennan, J.). While Wygant involved voluntary action and Paradise and Sheet Metal Workers involved court-ordered remedies, there was in all those cases a substantial basis for believing that remedial action was required.
 
 
 12
 Here, by contrast, proceedings before the City Council failed to establish the basis for remedial action. The debate, at the very end of a five-hour council meeting, revealed no record of prior discrimination by the city in awarding public contracts, aside from some conclusory and highly general statements made by a member of the public, a City Council member who supported the plan, and the City Manager. The member of the public who testified about discrimination was not even involved in the construction industry. The City Manager's comments mainly had to do with the city of Pittsburgh. Such meager evidence is not a sufficient finding of prior discrimination. The proceedings betray the very casualness about the use of racial distinctions in public enactments that Wygant warned against.
 
 
 13
 The only other evidence purporting to show discrimination in the assignment of contracts compared the percentage of minority contracts with the total number of minority residents in the community. Statistical records were said to indicate that minorities comprised 50% of Richmond's population but that minority-owned firms had received only 0.67% of the dollar value of Richmond's prime contracts. General population statistics suggest, if anything, more of a political than a remedial basis for the racial preference. According to the plurality in Wygant, this is exactly the kind of evidence that will not pass muster.
 
 
 14
 The appropriate comparison is between the number of minority contracts and the number of minority contractors, taking into account other relevant variables such as experience and specialties. Showing that a small fraction of city contracts went to minority firms, therefore, does not itself demonstrate discrimination; both sides agree that the number of minority-owned contractors in Richmond was also quite small. Wygant rejected a similar comparison in an employment context:
 
 
 15
 There are numerous explanations for a disparity between the percentage of minority students and the percentage of minority faculty, many of them completely unrelated to discrimination of any kind. In fact, there is no apparent connection between the two groups. Nevertheless, the District Court combined irrelevant comparisons between these two groups with an indisputable statement that there has been societal discrimination, and upheld state action predicated upon racial classifications.
 
 
 16
 106 S.Ct. at 1838.
 
 
 17
 Our holding today is likewise consistent with that of the Sixth Circuit in J. Edinger & Son, Inc. v. City of Louisville, 802 F.2d 213 (6th Cir.1986). In Edinger, the city of Louisville enacted a program to grant preferential treatment to racial minorities, women, and the handicapped in awarding its supply and service contracts. There, as in the present case, the need for the program was justified principally by general population statistics. Because general population statistics failed to address the "statistical disparity between the percentage of qualified minority business contractors doing business in Jefferson County and the percentage of bid funds awarded to those businesses," the Sixth Circuit found that the program did not comport with Wygant. 802 F.2d at 216. Accord Associated General Contractors of California v. San Francisco, 813 F.2d 922 (9th Cir.1987).
 
 
 18
 We do not suggest that the City Council should be held to as high a standard in its factfinding as, say, a federal district court. Justice O'Connor, in her concurrence in Wygant, identified the problems with requiring an extended mea culpa from localities seeking to eliminate a historical pattern of discriminatory practice. Legislative findings are, moreover, different from judicial ones; the City Council need not have produced formal, contemporaneous findings, so long as it had "a firm basis for believing that remedial action is required." Wygant, 106 S.Ct. at 1853 (O'Connor, J., concurring in part and concurring in the judgment).
 
 
 19
 In this case, however, the city has failed to show such a firm basis, either contemporaneously or at the district court level. The able trial judge could not point to any evidence beyond that relied upon by the City Council--namely, the spurious statistical comparison and the nearly weightless testimony. We cannot uphold the plan based on this evidence, nor would it be proper for us to develop a post hoc rationale for the city's racial preference.
 
 
 20
 In sum, the omissions in this case overshadow the evidence. There has been no showing that qualified minority contractors who submitted low bids were passed over. There has been no showing that minority firms were excluded from the bidding pool. Edinger, 802 F.2d at 216. There has been no showing--only the loosest sort of inferences--of past discrimination, without which Wygant does not permit a racial preference to stand.
 
 
 21
 The record in this case suggests that the City Council thought it was permissible simply to adopt the contract set-aside program upheld by the Supreme Court in Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). Much of the discussion in the hearings was apparently based on that premise, and some aspects of the Richmond plan follow the Fullilove set-aside to the letter. If the City Council did rely on that premise, it was in error. National findings do not alone establish the need for action in a particular locality. If they did, the Wygant Court's rejection of societal discrimination as a basis for remedial action would be undercut. For a locality to show that it enacted a racial preference as a remedial measure, it must have had a firm basis for believing that such action was required based on prior discrimination by the locality itself. The Court upheld the set-aside in Fullilove based on Congress's well-founded belief that such a program was needed at the federal level; the Court emphasized the special competence of Congress to act on such a finding. 448 U.S. at 483, 100 S.Ct. at 2777; 448 U.S. at 499-502, 100 S.Ct. at 2785-87 (Powell, J., concurring). Localities cannot disregard the line between remedial measures and political transfers by adopting the Fullilove program as though it were boilerplate.
 
 B.
 
 22
 The record of prior discrimination supporting the Richmond plan is deficient. Its deficiency is made more clear by comparison with plans considered in other circuits. For example, in Valentine v. Smith, 654 F.2d 503 (8th Cir.1981), the record of prior discrimination supporting the racial preference included reviews by the Office of Civil Rights of the Department of Health, Education, and Welfare (HEW) and also a successful Title VI suit in federal district court. A similar record supported the preference in Kromnick v. School Dist. of Philadelphia, 739 F.2d 894 (3d Cir.1984).
 
 
 23
 In Associated General Contractors v. Metropolitan Dade County, 723 F.2d 846 (11th Cir.1984), the locality had "reliable, substantial information compiled by independent investigations" that showed "identified discrimination against Dade County black contractors...." Id. at 853 (emphasis in original). The court in Ohio Contractors Assoc. v. Keip, 713 F.2d 167 (6th Cir.1983), found that the state's racial preference was a remedial measure partly because the legislators
 
 
 24
 were informed of the findings of racial discrimination in state contracting made in connection with an earlier joint resolution of the legislature and the contents of the report of a special 'task force' established by the state attorney general which found a severe numerical imbalance in the amount of business the state did with minority groups.
 
 
 25
 Id. at 171. The court went on to describe various studies comparing the volume of minority contracts with the number of minority businesses, rather than the minority population as a whole.
 
 
 26
 Finally, in Fullilove, the Supreme Court noted that Congress's decision to enact a minority set-aside for federal contracts was supported by reports of congressional committees, the U.S. Civil Rights Commission, and the General Accounting Office. See 448 U.S. at 465-67, 100 S.Ct. at 2768-69; id. at 503-06, 100 S.Ct. at 2787-89 (Opinion of Powell, J.).
 
 
 27
 Of course, we do not intimate any view on the adequacy of the plans described in Valentine, Kromnick, Associated General Contractors, and Ohio Contractors. These cases were all decided prior to the Wygant decision. We note only that the support offered for the Richmond plan is extremely weak in comparison. The plan was not supported by any impartial report, any meaningful statistical evidence, or even by anecdotal allegations of prior discrimination. Based on such a record, we cannot uphold the plan as a remedial measure under Wygant. If this plan is supported by a compelling governmental interest, then so is every other plan that has been enacted in the past or that will be enacted in the future.
 
 III.
 
 28
 Even if we accepted that the Richmond racial set-aside was justified by a need to remedy prior discrimination, the plan still fails because it is not narrowly tailored to that remedial goal. It is of central importance to equal protection under law that public distinctions between citizens on the basis of their race be narrowly and specifically framed. Wygant, 106 S.Ct. at 1849-50. The thirty percent quota was chosen arbitrarily; it was not tied, for example, to a showing that thirty percent of Richmond subcontractors are minority-owned. The figure simply emerged from the mists. The combination of a large set-aside and a small number of actual minority beneficiaries presents a special potential for abuse. As such, it imposes an overbroad competitive burden on non-minority businesses.
 
 
 29
 The competitive disadvantage is far greater than the thirty percent minimum set-aside suggests. In many construction contracts, the dollar allocation among subcontractors will not break into a thirty percent block. If, for example, a project required three subcontractors whose respective efforts represented 55, 25, and 20 percent of the total project cost, compliance with the Richmond ordinance could come only by awarding 55 or 45 percent of the total dollar amount to racially preferred businesses. In this case, the supply of plumbing fixtures represented 75 percent of the cost of the total project, an amount Croson was obliged to award to a minority enterprise in order to meet the minimum 30 percent set-aside. Such means "unnecessarily trammel the rights of innocent individuals directly and adversely affected by a plan's racial preference." Wygant, 106 S.Ct. at 1854 (Opinion of O'Connor, J.). The disadvantage is further compounded by the fact that minority prime contractors are exempt from the higher construction costs often imposed by the MBE subcontract set-aside while non-minority primes are subject to them. Richmond City Code, Ch. 24.1, Art. VIII-A(A).
 
 
 30
 In addition, the definition of minority-owned business is itself not narrowly tailored to the remedying of past discrimination. The Richmond plan defines "minority group members" as "[c]itizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." This definition nearly duplicates the definition that drew fire in Wygant:
 
 
 31
 The Board's definition of minority to include blacks, Orientals, American Indians, and persons of Spanish descent ... further illustrates the undifferentiated nature of the plan. There is no explanation of why the Board chose to favor these particular minorities or how in fact members of some of the categories can be identified. Moreover, respondents have never suggested--much less formally found--that they have engaged in prior, purposeful discrimination against members of each of these minority groups.
 
 
 32
 106 S.Ct. at 1852 n. 13.
 
 
 33
 The same aggregation problem is present in the Richmond plan. A record of prior discrimination against blacks by a governmental unit would not justify a remedial plan that also favors other minority races. The need for this kind of narrow tailoring, like the need for findings of past discrimination, arises because the governmental unit enacting a racial preference must limit itself to remedying past discriminatory practices.
 
 
 34
 Finally, as was noted by the prior opinion in this case, the presence of an expiration date and a waiver provision may help to narrow the scope of a plan's operation. Croson, 779 F.2d at 191. Those features cannot, however, salvage an ordinance which otherwise transgresses Wygant 's standards. Whether the Richmond plan will be retired or renewed in 1988 is, at this point, nothing more than speculation. Nor does the waiver here cure the constitutional defects defined by the Wygant decision. The waiver is to be granted "only in exceptional circumstances" and as a matter of administrative discretion. The burden of obtaining the waiver rests at all times upon the prime contractor who must demonstrate the unavailability or the unwillingness of racially preferred enterprises to participate in the contract project. See Croson, Appendix B, 779 F.2d at 179-80. We doubt that any waiver, let alone the restrictive provisions of the waiver in this case, could cure the objectionable aspects of the Richmond ordinance.
 
 
 35
 Although this case presents a Fourteenth Amendment claim rather than a Title VII claim, the Supreme Court's recent pronouncement on Title VII in Johnson, supra, is still instructive. The Court may have adopted a different standard for evaluating challenges to plans under Title VII than under the Fourteenth Amendment, but it has insisted in both contexts that remedial efforts must ensure fair treatment of whites and blacks, males and females. The Court stressed in Johnson that the Agency plan permitted competition among qualified aspirants, 107 S.Ct. at 1455; the Richmond plan, by contrast, aims to stifle competition in the interest of a rigid set-aside. The plan upheld in Johnson made race or gender "but one of numerous factors" considered by the government agency in its employment decisions. Id. The race or gender of an applicant was merely a "plus"; no rigid quotas or set-asides were used. The Court characterized the program as a "moderate, flexible, case-by-case approach to effecting a gradual improvement in the representation of minorities and women in the Agency's work force." Id. at 1457. None of the factors emphasized by the Court in Johnson apply to Richmond's plan, which features the combination of an inadequate foundation for remedial action plus a "reflexive adherence to a numerical standard" which the Supreme Court in Johnson disavowed. Id. at 1455.
 
 IV.
 
 36
 The Wygant requirements amount to more than a trivial hurdle for localities that wish to draw racial distinctions. They are the heart of the Supreme Court's approach to the constitutionality of remedial preferences. Nothing in Wygant outlaws all such preferences, and subsequent cases have clarified their reach. Wygant does, however, limit racial preferences to what is necessary to redress a practice of past wrongdoing. The Richmond ordinance reflects the most casual deployment of race in the dispensation of public benefits. It prefers some, and in so doing diminishes the rights of all. Wygant rejected that approach, and with it the notion that racial distinctions among citizens will ever become the perfunctory reality of public life.
 
 
 37
 The judgment of the district court is reversed and the case is remanded for a determination of appropriate legal and equitable relief.
 
 
 38
 REVERSED AND REMANDED.
 
 SPROUSE, Circuit Judge, dissenting:
 
 39
 As the majority notes, the Supreme Court remanded our previous decision for us to consider the constitutionality of the City of Richmond's affirmative action ordinance in light of Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). In my view the majority both misconstrues and misapplies Wygant. In his plurality opinion, Justice Powell stated that any classification based on race "must be justified by a compelling governmental interest," id. at 1846 (plurality opinion) (quoting Palmore v. Sidoti, 466 U.S. 429, 432, 104 S.Ct. 1879, 1881, 80 L.Ed.2d 421 (1984)), and "the means chosen ... to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.' " Id. (quoting Fullilove v. Klutznick, 448 U.S. 448, 480, 100 S.Ct. 2758, 2775, 65 L.Ed.2d 902 (1980)). Four justices in Wygant also expressed the view that "societal discrimination" is not a sufficient basis for demonstrating a compelling government interest.[3] I think the Richmond ordinance easily satisfies Justice Powell's two-prong test and, assuming that a majority of the Court eventually will adopt the "societal discrimination" modification, it satisfies the test even as modified.
 
 I.
 
 40
 On April 11, 1983, the Richmond City Council, the legislative body of the City of Richmond, voted six to three to adopt the affirmative action ordinance at issue in this case.[4] It acted in response to information presented at a public hearing held that day that, among other things, indicated that although minority groups made up fifty percent of the City's population, only two-thirds of one percent of the City's construction contracts from 1978-1983 were awarded to minority businesses. The ordinance required all contractors to whom the City awarded construction contracts to subcontract at least thirty percent of the dollar amount of the contract to minority business enterprises (MBEs) unless the City waived the requirement. The ordinance was expressly remedial, "enacted for the purpose of promoting wider participation by minority business enterprises in the construction of public projects."[5] It automatically expires on June 30, 1988.
 
 
 41
 During a prolonged debate prior to enacting the ordinance, the Council reviewed the history of public procurement in Richmond.[6] The Council and witnesses had available historical records of city contracting, which showed that minorities, who constituted fifty percent of the City's population, had been awarded over a five-year period only two-thirds of one percent of the City's contracting business. The debate was sharp, and the issue was well defined. Unchallenged statements of council members demonstrated that the ordinance was designed to serve a remedial purpose. One councilman observed that the Council had "reviewed the history of the construction contracts" and structured the proposed ordinance in accordance with federal law (presumably the statute interpreted by the Supreme Court in Fullilove ). Another councilman stated:
 
 
 42
 And I can say without equivocation, that the general conduct in the construction industry in this area, and the State and around the nation, is one in which race discrimination and exclusion on the basis of race is widespread.
 
 
 43
 I think the situation involved in the City of Richmond is the same, and I would like to give the Clerk a copy of the listings of the contracts for the past five years awarded by the City of Richmond. Contracts totalling over 124 million dollars. And less than one percent were given--were awarded to minorities. I think the question of whether or not remedial action is required is not open to question.
 
 
 44
 A city councilman and the city manager further urged that the construction industry discriminated against persons on the basis of race, both in the city of Richmond and the state of Virginia. A number of contracting association representatives took part in the hearing, and none denied this claim--although several asserted that their own organizations did not discriminate on the basis of race.[7] Proponents of the ordinance asserted that this discrimination was parallel to and part of the discrimination that currently existed in the nation's construction industry.[8] Likewise, opposing witnesses and council members did not deny this assertion. As noted, after the debate ended the Council approved the "set-aside" ordinance by a vote of six to three.
 
 II.
 A.
 
 45
 In the majority's view, the Council totally failed to establish prior discrimination in the awarding of public construction contracts. This is a slippery foundation upon which to build the principal part of its opinion.[9] Assuming, however, a requirement that lacked majority support in Wygant, I am persuaded that the Richmond Council had a firm basis for believing it had engaged in past discrimination in awarding public contracts.
 
 
 46
 Initially, it is essential that we keep our appellate task in the proper perspective. We are not reviewing findings of fact and, as the majority concedes, we do not review the Council's actions under the same criteria by which we review judicial decisions. If that were the case, our review would intrude into the local legislative process and impose undue limitations on local policymakers. Here, however, we need only be assured that the council members, "who are presumably fully aware both of their duty under federal law to respect the rights of all their [contractors] and of their potential liability for failing to do so, act[ed] on the basis of information which g[ave] them a sufficient basis for concluding that remedial action is necessary...." Wygant, 106 S.Ct. at 1855-56 (O'Connor, J., concurring). As Chief Justice Burger has observed, "Congress, of course, may legislate without compiling the kind of 'record' appropriate with respect to judicial or administrative proceedings." Fullilove, 448 U.S. at 478, 100 S.Ct. at 2774 (plurality opinion). The Chief Justice was considering congressional power in a tripartite government context, but his observation also relates to the legislative nature of the proceedings. We should at least give similar deference to the Council's proceedings. Considering the gross disparity between the resources of the City Council of Richmond and the United States Congress, I am convinced that the Council proceeded on a firm basis for believing that its ordinance was necessary to remedy the effects of prior racial discrimination in the awarding of public construction contracts.
 
 
 47
 The Council was satisfied that the pervasive discrimination existing in the nation's craft unions and construction businesses also existed in Richmond. Minority contractors had received only two-thirds of one percent of city construction contracts between 1978 and 1983, although the minority population of Richmond during this period was approximately fifty percent. The Council was convinced that this disparity resulted from purposeful discrimination against minority contractors.
 
 
 48
 I would not disagree with the majority's observation that the Council did not make particularized findings of past discrimination.[10] 0] No one testified, for example, that he had applied for a city contract and was denied it because he was black. However, not only is such evidence "hard to come by," but municipal legislative proceedings simply are not geared to producing it, even if it is available. Additionally, as Justice O'Connor recognized, the requirement of such a mea culpa finding might be fatally counter-productive to the concept of affirmative action.
 
 
 49
 A statistical showing is not a prerequisite to an affirmative action plan and is particularly inappropriate in situations of this type. There are, for example, one hundred thirty members in the general contractor association of Richmond. None are black. Information developed during the council debate revealed that blacks constitute less than one percent of construction contractors involved in all crafts. The award of two-thirds of one percent of public contracts to an approximately equivalent percentage of qualified minority contractors would hardly establish a statistical prima facie case of discrimination.
 
 
 50
 It seems inevitable, however, that a proof scheme requiring a comparison of the percentage of contracts awarded with this small qualified pool of minority contractors would ensure the continuation of a systemic fait accompli, perpetuating a qualified minority contractor pool that approximates two-thirds of one percent of the overall contractor pool.[11] It is true that in a case amenable to statistical proof, a comparison of the percentage of construction contracts awarded to minority contractors and the percentage of minorities in the general population usually would be probative of "societal discrimination." I suggest, however, that two-thirds of one percent compared to a minority population of fifty percent breaks the bounds of the sometimes suspect "science" of statistics and is probative of a good deal more than general discrimination.
 
 
 51
 In my view, therefore, not only was the traditional statistical data unavailable, it was not necessary to support the Council's conclusions. The Council, for the reasons I have discussed, had a firm basis for concluding that the remedial ordinance was necessary to cure the ills of past discrimination in awarding public contracts.
 
 B.
 
 52
 As I have said, this "firm basis" satisfies the compelling state interest test, even considering the "societal discrimination" limitations that might modify that requirement. Justice Powell in Wygant stated:
 
 
 53
 Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy.
 
 
 54
 * * *
 
 
 55
 No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory legal remedies that work against innocent people, societal discrimination is insufficient and over expansive.
 
 
 56
 Wygant, 106 S.Ct. at 1848 (plurality opinion). Justice Powell expressed this concern against the background of the explicit approval by the circuit court in Wygant of the "role model" and "societal discrimination" bases for the affirmative action plan involved there. In this case, however, there was no suggestion before the Council that the Richmond business community needed a "role model" in the form of highly visible minority contractors performing public work, or even that the minimal presence of minority contractors in that endeavor was caused by such "societal" discriminatory factors as past inferior education or lack of access to social institutions.
 
 
 57
 The conclusions that emerged from the Council's debate concerned the City's previous discrete discrimination in awarding contracts for public construction projects. However, even if the lack of contracts awarded to minority contractors resulted from both societal discrimination and discrete discrimination in public construction, that fact should not preclude an affirmative action remedy for the latter. The line between "societal" discrimination and discrete discrimination may in fact sometimes be illusory.[12] For example, Justice O'Connor noted that the court of appeals in Wygant apparently had assumed "that in the absence of a specific, contemporaneous finding, any discrimination addressed by an affirmative action plan could only be termed 'societal.' " Wygant, 106 S.Ct. at 1854 (O'Connor, J., concurring). She emphasized that such an assumption was false. Id. Here, "societal discrimination" may have been a force encouraging disparate treatment in many specific areas of human endeavor. The Council, however, was entirely concerned with discrimination discretely directed at minority contractors, not with the general "societal discrimination" that only coincidentally included contractors within its negative sweep.
 
 III.
 
 58
 I also think the majority completely misses the mark with its conclusion that the ordinance is not narrowly tailored to achieve its remedial goal.[13] There is no question, of course, that such tailoring is an essential element of an affirmative action plan. In Fullilove, however, Justice Powell noted that the Supreme Court "has not required remedial plans to be limited to the least restrictive means of implementation." Fullilove, 448 U.S. at 508, 100 S.Ct. at 2790 (Powell, J., concurring). Moreover, Justice Powell identified several considerations to guide the determination of whether the plan is sufficiently narrow, e.g., the duration of the plan, the availability of waiver provisions, the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force, and the effect on innocent third parties. 448 U.S. at 510-11, 100 S.Ct. at 2791 (Powell, J., concurring). I am convinced that under these criteria the ordinance is sufficiently narrow.
 
 
 59
 The first two criteria need little discussion. The Richmond Plan is designed to last only five years. Its waiver provisions were purposefully drawn to parallel those approved in Fullilove. Even the majority concedes, as it must, that these factors help narrow the scope of the ordinance.
 
 
 60
 The third criterion identified by Justice Powell requires a more detailed analysis. It must be conceded that a set-aside plan limited to the current percentage of minority contractors would not eliminate the present low level of minority participation in government contracting. In remedying the effects of discrimination, a program obviously must set aside much more than two-thirds of one percent of subcontract work if it is to encourage minorities to enter the contracting industry and encourage existing minority contractors to grow.[14] See Fullilove, 448 U.S. at 513-14, 100 S.Ct. at 2792-93 (Powell, J., concurring) (10% set-aside acceptable, where 17% of the population and only 4% of the contractors were minority group members); Schmidt v. Oakland Unified School Dist., 662 F.2d 550, 559 (9th Cir.1981), vacated on other grounds, 457 U.S. 594, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982) (25% goal acceptable in light of city's 34.5% non-white population; decision vacated for failure to reach merits of state statutory issue prior to deciding constitutional claim); Southwest Washington Chapter, Nat'l Elec. Contractors Ass'n v. Pierce County, 100 Wash.2d 109, 667 P.2d 1092, 1101 (1983) (MBE participation goal of 11% set at slightly less than county's minority population held acceptable). Common sense dictates that judging the set-aside percentage by referring to the small proportion of existing MBEs in the economy would perpetuate rather than alleviate past discrimination.
 
 
 61
 As to Justice Powell's last suggested criterion, i.e., the effect on innocent third parties--the favoring of a percentage of minority contractors will, of course, disfavor a percentage of nonminority contractors. That is the negative side of the necessary balancing in any affirmative action program: "innocent persons may be called upon to bear some of the burden" of remedying the effects of discrimination. Wygant, 106 S.Ct. at 1850 (plurality opinion). Here, however, as with hirings in employment cases (as opposed to layoffs ), the result is not to deprive a nonminority member of something already possessed but to limit temporarily a future opportunity. This distinction has been noted with approval in a number of Supreme Court cases. In Wygant, for example, Justice Powell said:
 
 
 62
 In cases involving valid hiring goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.
 
 
 63
 106 S.Ct. at 1851 (plurality opinion) (emphasis in original). The ordinance is narrowly drawn; it satisfies all of the Fullilove criteria.
 
 
 64
 For all these reasons, I would affirm the judgment of the district court.
 
 
 
 [1]
 Unless otherwise noted, the references to Wygant herein refer to the plurality opinion. The plurality opinion of Justice Powell was joined by Chief Justice Burger and Justice Rehnquist; it was also joined in part by Justice O'Connor, who wrote separately. Justice White concurred in the judgment and wrote separately
 Our analysis of the Richmond plan comports, we believe, with the views expressed in all three opinions. Although Justice White did not elaborate in Wygant on the requirements of particularized findings and narrowly tailored means, he certainly did not indicate that he would permit localities greater latitude in this regard than Justices Powell and O'Connor. Of critical importance is the fact that five Justices concurred in the judgment that the racial preference in Wygant was unconstitutional.
 
 
 [2]
 The Supreme Court's decision in Johnson, supra, does not alter Wygant 's requirement of a showing of prior discrimination. The Johnson Court addressed only a Title VII claim, not a Fourteenth Amendment claim such as the one now before us. The Court stated that if a Fourteenth Amendment claim were before it in Johnson, the Wygant standard would come into play. 107 S.Ct. at 1446 n. 2; id. at 1449-50 n. 6
 
 
 [3]
 The majority correctly states that five Justices concurred in the judgment that the remedy in Wygant was unconstitutional. It also properly notes, albeit somewhat implicitly, that Justice White, who provided the crucial fifth vote in the case, did not join in the opinions of either Justice Powell or Justice O'Connor. The majority's assertion, therefore, that the "Wygant Court[ ] reject[ed] ... societal discrimination as a basis for remedial action," At 1359, is misplaced. Only four Justices adopted this position, Justice White did not
 
 
 [4]
 See generally Richmond, Va.Code Ch. 24.1, Art. I(F) (Part B) (27.10) (27.20) and Art. VIII-A
 
 
 [5]
 Richmond, Va.Code Ch. 24.1, Art. VIII-A(C)
 
 
 [6]
 At the hearing, the Council heard from: Esther Cooper; Freddie Ray, President of Task Force for Historic Preservation in Minority Communities; Stephen Watts, attorney representing Associated General Contractors of Virginia; Richard Beck, president of a local plumbing contractors' association; Mark Singer, a representative of the electrical contractors' association; Patrick Murphy, American Subcontractors Association; Al Shuman, Professional Estimators Association. During the debate between Council members, those opposed to the ordinance contended it was unfeasible because there were insufficient numbers of minority contractors, because it would inflate contract bids and because it would not be conducive to top quality work. Council members favoring the ordinance emphasized the history of discrimination in the construction industry, the current difficulties encountered by MBEs in the Richmond area, and the success of similar set-aside programs in other parts of the country. Hearing on Adoption of Minority Business Utilization Plan, Richmond City Council, April 11, 1983
 
 
 [7]
 One of the contractor representatives speaking in opposition to the bill cited statistics to the effect that, of the construction contractors in the United States, only 4.7% were minority contractors and 41% of that figure were located in five states. The balance were scattered among the other 45 states, including Virginia. In other words, in a 45-state area (including Virginia) only 2.8% of the contractors were minorities. The spokesman for the general contractors of Virginia testified that there were 600 contractors in the state association and 130 in Richmond. None were black. Other witnesses testified that none of the 150 Virginia plumbing, heating and cooler contractors were black; that three of the 200 electrical contractors in the state were black; that none of the 150 to 200 Virginia members of the American Subcontractors Association were black; that one of 60 members of the central Virginia contractors association was black; and that one of 45 professional estimators in the Richmond association was black
 
 
 [8]
 The Supreme Court in United Steelworkers of America v. Weber, 443 U.S. 193, 198 n. 1, 99 S.Ct. 2721, 2725 n. 1, 61 L.Ed.2d 480 (1979), noted that: "[j]udicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice."
 
 
 [9]
 It must be emphasized that Wygant simply does not mandate "particularized findings" of "prior discrimination by the government unit involved," At 1357 and 1358 (emphasis in original), as a constitutional prerequisite to the validity of a race-conscious remedy for unlawful discrimination. The suggestion that a public entity may never implement such a remedy to redress the effects of discrimination it had not perpetrated is supported only by Justice Powell's opinion for a three-Justice plurality. Even that opinion did not make, in the words of the present majority, "particularized findings ... [of actual discrimination] essential." Id. at 1357. Indeed, a majority of the Court disclaimed any such requirement, see Wygant, 106 S.Ct. at 1853 (O'Connor, J., concurring), and only four Justices would expressly require a public actor to document (at minimum) that it "has a firm basis for believing that remedial action is required." See id
 
 
 [10]
 Under the view held by a majority of the Court in Wygant, such findings clearly are not necessary. See supra p. 1363, n. 7. In her concurring opinion, Justice O'Connor stated "[t]he imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations." Wygant, 106 S.Ct. at 1855 (O'Connor, J., concurring)
 
 
 [11]
 To require such a proof scheme, as does the majority, creates a gross anomaly. To illustrate, assume that in some metropolitan areas, the percentage of qualified minority contractors is approximately equivalent to the percentage of minorities in their general population. An affirmative action plan might be allowed in these areas because there would be a statistical basis to show a discrepancy between the percentage of minorities awarded contracts and the percentage of qualified minority contractors. In contrast, a plan would not survive the proof scheme in areas where discrimination had effectively prohibited the entry of minorities into the contracting business, as in Richmond, because there would be no discrepancy between the two points of comparison. It is anomalous that truly pernicious discrimination could have the compound effect of blocking remedial action
 
 
 [12]
 A good argument can be made that the converse of Justice Powell's statement is also true--discrimination that is not amorphous cannot merely be labeled "societal discrimination" and dismissed from consideration in establishing affirmative action programs. Lawyer and humanitarian that he is, I cannot believe that Justice Powell meant to dismiss concrete examples of man's inhumanity to man simply because the deprivation was not caused by an identified employer or governmental representative. What is amorphous to one unaffected may be all too painfully clear to one whose livelihood has been adversely affected or whose children cannot receive opportunities equal to their brethren. I do not understand Justice Powell's position to be that societal discrimination can never be part of an appropriate basis for imposing such a remedy. Instead, I believe he is saying that before an entity enacts an affirmative action program, it must have a strong basis for concluding the program is necessary to correct racial imbalances directly attributable to racial discrimination, whether or not it is in part societal discrimination
 In Wygant, for example, a number of unexplained reasons could have accounted for the disparity between the percentage of minority teachers and the percentage of minority students in the Jackson school system. A generalized belief that some amorphous, or "societal," discrimination contributed to that disparity was insufficient to justify the School Board's affirmative action program. In Fullilove, however, the program constituted an appropriate remedy, in light of Congress' well-documented finding that both public and private discrimination directly contributed to the small percentage of public contracts awarded minority contractors. There, Justice Powell concurred in the Court's judgment that upheld Congress' ten-percent set-aside program for minority contractors.
 
 
 [13]
 As an alternative basis for its holding, the majority concludes that the ordinance is not narrowly tailored to the remedial goal of eliminating discrimination. It reasons that the thirty-percent minority set aside is over-inclusive and hypothesizes that in certain contracts the thirty-percent figure would have to be adjusted upward. These conclusions of the majority lack evidentiary support; to use a phrase coined by the majority, they "emerge[ ] from the mists."
 In their opinions in Wygant, both Justices Powell and O'Connor reaffirmed the principle that the plaintiff bears the overall burden of proving the constitutional invalidity of an affirmative action plan. Wygant, 106 S.Ct. at 1848 (plurality opinion); id. at 1856 (O'Connor, J., concurring). In the present case, the plaintiff presented no evidence to the trial court to suggest that the thirty-percent set aside was overbroad. The majority's finding of over-inclusiveness, therefore, suffers from the same lack of a "firm basis" that it erroneously imputes to the Council.
 
 
 [14]
 The Supreme Court most recently approved a similar approach in United States v. Paradise, --- U.S. ----, 107 S.Ct. 1053, 94 L.Ed.2d 203 (U.S.1987) where the evidence demonstrated that the Alabama Department of Public Safety steadfastly had resisted the promotion of black troopers. See also Johnson v. Santa Clara County, --- U.S. ----, 107 S.Ct. 1442, 94 L.Ed.2d 615 (U.S.1987); Local 28 of the Sheet Metal Workers Int'l Ass'n v. EEOC, --- U.S. ----, 106 S.Ct. 3019, 3050-51, 92 L.Ed.2d 344 (1986). Although approaching the problem in a different procedural context, the decision in Paradise demonstrated the propriety of a temporarily imposed overrepresentation to meet a long-range goal. After considerable litigation, the district court ruled that fifty percent of all promotions from trooper to corporal must be from a labor pool consisting of black troopers, even though that pool consisted of only twenty-five percent of the total trooper pool. Responding to the Department's argument that this exceeded a statistical balance by twice, the Court said:
 The Government suggests that the one-for-one requirement is arbitrary because it bears no relationship to the 25% minority labor pool relevant here. This argument ignores that the 50% figure is not itself the goal; rather it presents the speed at which the goal of 25% will be achieved. The interim requirement of one-for-one promotion ... would simply have determined how quickly the Department progressed toward this ultimate goal.
 * * *
 Although the appropriate ratio here "necessarily involve[d] a degree of approximation and imprecision," Teamsters v. United States, 431 U.S. 324, 372 [97 S.Ct. 1843, 1873, 52 L.Ed.2d 396] (1977), the District Court, with its first-hand experience of the parties and the potential for resistance, imposed the requirement that it determined would compensate for past delay and prevent future recalcitrance, while not unduly burdening the interests of white troopers.
 Paradise, --- U.S. at ----, 107 S.Ct. at 1070 (footnote omitted).