WILKINSON, Chief Judge,
concurring
in part: I concur in Parts I, II, IV, and V of Judge Trader's thorough opinion. With respect to Parts III and VI, I respectfully take a different view.
I.
There can be no doubt that if the 1992 Charlotte-Meeklenburg magnet school program were adopted today, it would be unconstitutional and in violation of our holdings in Tuttle v. Arlington County Sch. Bd., 195 F.3d 698 (4th Cir.1999), and Eisenberg v. Montgomery County Pub. Schs., 197 F.3d 123 (4th Cir.1999). Those holdings properly emphasize the ecumenical premise of the Fourteenth Amendment that every American citizen regardless of race or ethnicity is deserving of equal dignity under the law.
The more difficult question is whether the adoption of the magnet school program in 1992, at a time when the school board was under a court desegregation order, stripped the Board of its immunity. I would hold that it did not. Inasmuch as the Board did not forfeit its immunity, I would vacate the award of damages against it and the fees and costs assessed thereon.[1]
Both the Supreme Court’s Swann opinion and various lower court opinions relied for many years upon numerical benchmarks as an indicia of progress in achieving school desegregation. That emphasis, however, was primarily the work of the courts, not the school board. And judicial decisions further made clear that the Charlotte-Meeklenburg school board could take the numerical approach of the courts even further in the course of devising de-segregative remedies of its own.
For instance, in Swann, the Supreme Court itself held that: “School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude ... that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities.” Swann v. Charlotte-Meeklenburg Bd. of *354 Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (emphasis added).
Likewise, in Swann v. Charlotte-Mecklenburg Bd. of Educ., 501 F.2d 383 (4th Cir.1974) (en banc) (per curiam), parents of white students brought suit against the school board because it allegedly had established a set-aside for African-American students to take part in its gifted students program. Id. at 383. This court affirmed an injunction prohibiting the plaintiffs from proceeding in state court. We held that the plaintiffs’ suit could affect the school board’s efforts to comply with prior federal court desegregation orders, including one which required the Board to assign students in such a manner that the schools would have about the same proportion of African-American and white students. Id. at 384.
And the district court’s desegregation orders in this case can fairly be read to encourage, rather than foreclose, the conduct in which the school board here engaged. For instance, in 1970, Judge McMillan ordered that “the defendants maintain a continuing control oyer the race of children in each school, ... arid maintain the racial make-up of each school .... The defendants are encouraged to use their full ‘know-how’ and resources to attain the results above described, and thus to achieve the constitutional end by any means at their disposal. The test is not the method or plan, but the results.” Swann v. Charlotte-Mecklenburg Bd. of Educ., 311 F.Supp. 265, 268-69 (W.D.N.C.1970) (emphasis added). And four years later, in an order addressing optional schools, which were the precursors of the magnet schools, Judge McMillan ordered that: “Strict and central control must be exercised over all admissions (reassignments) to each optional school in order to fulfill the necessary ends that these schools ... be integrated by grade at or above approximately a 20% black ratio.” Swann v. Charlotte-Mecklenburg Bd. of Educ., 379 F.Supp. 1102, 1108 (W.D.N.C.1974) (emphasis added).
While this case was removed from the active docket in 1975, Judge McMillan noted that: “This case contains many orders of continuing effect, and could be reopened upon proper showing that those orders are not being observed.” Swann v. Charlotte-Mecklenburg Bd. of Educ,, 67 F.R.D. 648, 649 (W.D.N.C.1975); see also Martin v. Charlotte-Mecklenburg Bd. of Educ., 475 F.Supp. 1318, 1340 (W.D.N.C.1979) (upholding the school board’s 1978 pupil assignment plan which took into consideration the race of the student).
Magnet schools are a widely used desegregation device. It is true that in the early 1990’s, the school board in its magnet program eagerly accepted the courts’ invitation to rely upon numerical benchmarks. I believe, however, that it is necessary to afford a school board some latitude in attempting to meet its desegregative obligations if we are not to undermine the rule of law. To do otherwise leaves the Board between a rock and a hard place. Namely, if the school board fails to carry out the court desegregation order, it can be cited for contempt or held not to have achieved unitariness. But if the Board acts aggressively to implement the court order, it risks facing judicial condemnation and the threat of litigation on the grounds that it was acting ultra vires. This is not the kind of quandary into which we should force institutions that are, for better or worse, under judicial decree.[2] Such an approach risks undermining respect for *355 courts and, indeed, encouraging just the opposite.
My fine colleague, Judge Luttig, insists that the issue here has solely to do with racial quotas. I have strongly disapproved of the use of such quotas. See, e.g., J.A. Croson Co. v. City of Richmond, 822 F.2d 1355 (4th Cir.1987), aff'd, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); Maryland Troopers Ass’n, Inc. v. Evans, 993 F.2d 1072 (4th Cir.1993). Indeed I believe them to be inimical to a national future founded, as the Fourteenth Amendment requires, upon individual respect and mutual self-regard. Yet to see the sole issue here as racial quotas is to miss the forest for the trees. The cumulative message of innumerable court orders conveyed to the Charlotte-Mecklenburg board over the course of many years was to do everything possible to desegregate Charlotte schools. See, e.g., Swann, 402 U.S. at 15, 91 S.Ct. 1267 (“[Sjchool authorities are ‘clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.’ ”) (quoting Green v. County Sch. Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)) (emphasis added). And the school board attempted to do just that. To now condemn the Board would be to sanction the future disrespect and disregard for court orders of all sorts. This I am unwilling to do.
If an existing court order is infirm, the better course is to modify it through customary court processes. Today, we follow this approach with our determination that the school district has attained unitary status. This holding puts the school district on a race-neutral footing going forward, thereby granting it a truly fresh start. The solution to the fundamental Fourteenth Amendment problems with the 1992 magnet school plan is not to hold the Board liable for its attempts to implement the very policies, and attain the very ends, which the courts had ordered it to do. The answer is to point to a unitary future in which the principle of non-discrimination will guide its public actions.
II.
I concur fully in Judge Traxler’s view that the Charlotte-Mecklenburg school system has achieved unitary status. I recognize that some citizens of Charlotte, aware of society’s shortcomings on matters of race, may see in unitariness a mocking phrase. Others may view today’s embrace of local governance as an act of judicial abandonment. The luminosity of Brown v. Board of Education is such that many have come to look at courts as our sole guiding lights. Yet they were never meant to be such. If it was important that courts nurture the task of desegregation in its infancy, it is equally essential that a school district one day depart the comforting judicial homestead and strike out on its own. School districts will be stronger for finding their own way. For in the long run, courts cannot serve as the sole source of hope in the difficult area of desegregation, nor democracy as the object of fear. “Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system. When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course.” Freeman v. Pitts, 503 U.S. 467, 490, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).
The question then is whether the Charlotte-Mecklenburg system is ready for this step. The district court concluded that it *356 was. See Riddick v. School Bd. of the City of Norfolk, 784 F.2d 521, 533 (4th Cir.1986) (holding that the district court’s unitary status finding is reviewed for clear error). It is, I suppose, possible for us to reweigh the evidence or to refract this or that school board decision through a myriad of lenses. While any record, thus dissected, would be found to reveal its share of imperfection, a reversal of the district court’s finding of unitariness would do a profound disservice to the people of Charlotte. The recent history of Charlotte, as Judge Trax-ler’s careful opinion demonstrates, is not one of resistance and intransigence. Rather it shows a community struggling to meet its desegregative obligations in a period of staggering demographic change. Most importantly, African-Americans are vigorous participants both in the elective and deliberative process with regard to Charlotte’s schools.
Of course, the majority’s sense of progress may be the dissent’s sense of great unfinished business. And let us suppose just for a moment that both are right. Still, I doubt that interminable court proceedings can convey to Americans the sense that we are in the enterprise of education together. For litigation depends for its energy on adversarial alignments, i.e., the school board and Swann plaintiffs are tentatively aligned, but the Swann plaintiffs and Capacchione plaintiffs are decidedly not. And while democracy has no shortage of conflict, reaching decision and compromise from within the community, as opposed to the external compulsion of court order, promises a better mutual understanding and a firmer common ground.
That at least is the hope. In this sense, then, unitariness is not an act of abandonment but a covenant of faith. It reflects a judicial belief, well supported by this record, that the invidious practices of an indefensible era have indeed been dismantled and that Charlotte has earned the right to begin anew. No decisions are more sensitive and difficult than those involving public schools, and no process is more wrenching than that of matching limited resources to a limitless array of educational needs. But these challenges are better met by communities than by courts and, after thirty-five years of sporadic judicial supervision, the time has come to conclude. If not now, when? Each child is a human being to educate. If this essential task of education has become too daunting for democracy, then I know not who we are or what we shall become.
I am authorized to say that Judge Niem-eyer joins in this opinion.

. Although the Grant plaintiffs have prevailed with regard to the unitary status determination, their basis for prevailing was not an action under 42 U.S.C. § 1983. Accordingly, there exists no statutory basis here for deviating from the American Rule. Under this rule, fees are not generally awarded to prevailing parties "absent explicit statutory authority.” Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 121 S.Ct 1835, 1837-39, 149 L.Ed.2d 855 (2001) (internal quotation omitted). And the Supreme Court has emphasized that the judiciary enjoys no “roving authority” to award counsel fees "whenever the courts might deem them warranted.” Id. at 1843.

. The quandary in fact is illustrated by this very case where five members of the court feel the Board went too far in its remedial efforts, and four others believe just as strongly that the Board did not go far enough.